294 So.2d 803 (1974)
Donald Ray SPILLERS
v.
MONTGOMERY WARD & COMPANY, INC., et al.
Nos. 54029, 54030.
Supreme Court of Louisiana.
April 29, 1974.
Rehearing Denied June 7, 1974.
*804 Troy E. Bain, Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, for plaintiff-applicant.
Jesse D. McDonald, Hudson, Potts & Bernstein, Monroe, John M. Madison, Jr., Wilkinson, Carmody & Peatross, Shreveport, R. L. Davis, Jr., Theus, Grisham, Davis & Lehigh, Monroe, for defendants-respondents.
*805 DIXON, Justice.
This is a personal injury suit arising out of the explosion of a truck tire wheel. We granted two writ applications. Plaintiff's application assigned as error the failure of the prior courts to hold defendant, Reliable Motors, Inc., responsible for the damage to plaintiff, and the reduction of plaintiff's award from $85,000.00 to $28,635.36 by the Court of Appeal; the other application for writs was made by defendant G & S Manufacturing Company, Inc. and its insurer Truck Insurance Exchange. These applicants assigned as error the finding by the Court of Appeal that they were liable for the defects and the damage, the finding by the Court of Appeal that Reliable Motors, Inc. was not responsible, and the amount of damages fixed by the Court of Appeal.
This case was tried by a jury, which returned a verdict in favor of plaintiff for $85,000.00 against G & S Manufacturing and its insurer and against Montgomery Ward. The plaintiff's demands against Reliable were rejected. The Court of Appeal affirmed the judgment, but reduced the amount awarded from $85,000.00 to $28,635.36. Spillers v. Montgomery Ward & Co., Inc., 282 So.2d 546 (La.App.1973).
Plaintiff was a twenty-nine year old married man who intended to enter the pulpwood business. He located a used truck at Reliable Motors in Ruston, which, with modifications and additions, could be adapted to his purposes. The truck salesman took him to inspect another truck which had been so adapted. Spillers agreed to buy the truck and pay for the adaptation, which was to be done by defendant, G & S Manufacturing Company, Inc., at its plant in Hope, Arkansas.
The truck sold to Spillers had one rear axle. In order to accommodate the load of pulpwood, it was necessary to add an additional rear axle. This assembly was called a "tag axle."
The modification of the truck by G & S Manufacturing was not insubstantial. The total cost of the truck, paid by Spillers, was $5495.00, $1490.00 of which was attributable to the modification. $390.00 of this amount was attributable to the tag axle. $575.00 was attributable to the pulpwood loader, $195.00 to a frame, and the balance to protective devices for the truck, and a tool box.
G & S Manufacturing had done business with Reliable Motors through the years, and the personnel of each was familiar with the personnel of the other. Orders were usually placed over the telephone. Reliable Motors usually, as in this case, delivered the truck to G & S, and picked it up on completion of the modification.
The manufacturer and installation of the pulpwood loader was a substantial portion of the business of G & S. G & S also manufactured and sold a machine designed to clean chicken houses. The pulpwood loader and the chicken house cleaner constituted almost the entire business of this twenty-man manufacturing concern. Reliable Motors specified that G & S should also furnish the wheels necessary to complete the tag axle. Spillers was to purchase the tires for the wheels after the truck was delivered to him.
Tag axles can be purchased new; the practice at G & S was to fabricate their own from used parts obtained at a local junk yard. The price of a new tag axle would have been more than twice the amount charged by G & S. There was no discussion between Spillers and any person about whether the tag axle would be new or used. There is no contention that Spillers thought he would get new equipment for the tag axle, or that he would have specified a new one if it had been discussed.
G & S Manufacturing purchased rear axle housings which were taken from junked trucks at a junk yard in Hope. When thus purchased, the rear axle housing was usually equipped with wheels and rims.
*806 There is some conflict in the evidence about whether the axle in this case was purchased immediately before it was installed on the Spillers truck, or whether it was taken from an old truck owned by G & S which G & S had used in prior years in a pulpwood venture. The evidence preponderates that the axle and wheels installed on Spillers' truck were already in possession of G & S when the order was received to equip Spillers' truck for pulpwood hauling. Even so, the evidence indicates that the tag axle had probably been purchased by G & S years before from a nearby junk yard, and installed on its own truck.
When the axle had been attached to Spillers' truck the workman at G & S brushed the rim and wheel assembly with a wire brush and applied black paint. The wheels and rims were placed in the tool box when the truck was delivered to Reliable Motors and Spillers.
Reliable Motors made no inspection of the wheels and rims, other than to note that they were in the tool box. Spillers took delivery of his truck and took it to the local tire shop operated by defendant, Montgomery Ward & Company, Inc., where Spillers planned to buy tires and have them mounted on the wheels and have the wheels mounted on his vehicle.
It was during this process that one of the wheels exploded injuring the plaintiff, on April 23, 1970. Spillers arranged to purchase four tires and tubes and have them mounted; two on each end of the tag axle. He left the vehicle at Montgomery Ward and returned shortly before the completion of the operation. Three tires had been mounted on the truck. The fourth tire had been mounted on the wheel, and a Montgomery Ward employee was standing with the tire, waiting for assistance to mount the wheel on the axle when the assembly exploded, injuring the plaintiff.
The wheel involved was called a splitrim wheel. There are two pieces. The larger piece contains a rim attached to a plate with five small holes and one large hole, which slips over the axle and is bolted to the drum. The smaller piece is a circular band of heavy metal, forming a portion of the rim. It is shaped and sized so that it can be forced over a flange on the larger portion. It is itself flanged so that it holds the tire on the rim.
The evidence indicates that this is a common type of truck rim, and that this particular rim bore a manufacturer's date, 9/1/54, stamped on it. If there are other types of truck rim of this size (the tires purchased were 900 × 20) the testimony does not indicate it. The testimony of most of the witnesses who worked in the tire shop showed that all had heard of truck wheels exploding.
The wheel and rim are obviously not new. They are both pitted, as from rust through the years. As indicated, G & S employees had painted the wheel and the rim with black paint. One of the Montgomery Ward employees who participated in mounting the wheels testified that, as the wheel and rim appeared in court, it would not be safe to mount a tire on them.
Those who mounted the tires in Montgomery Ward's shop used safety chains as a precaution against explosions. Their procedure was to place the tire, with tube and flap in place, over the larger part of the wheel. Then the rim, which has a small notch on its inside perimeter to assist in mounting, is struck with a mallet and forced over the flange of the larger part of the wheel. At this stage, two chains are placed around the wheel, rim and tire to prevent their separation in case of malfunction. The tire mounter then inflated the tire until it contained eighty-five pounds of air pressure.
The safety chains were then removed and the tire was rolled about twenty feet. The explosion occurred while the tire was perfectly still.
The force of the explosion hurled the larger part of the wheel about one hundred *807 feet. The smaller rim struck Spillers with such force that he was knocked to the ground. His left tibia and fibula were shattered. The force of the blow was such that a part of Mr. Spillers' boot was driven into the wound on his leg.
The evidence is uncontradicted that the tire and rim involved in this explosion had suffered from rust and scale, which had the effect of reducing the size of the flange on the large part of the wheel and increasing the diameter of the flange surface on the smaller part of the wheel. It is not argued that the wheel assembly was safe.
The employees of G & S checked the wheels, but checked them for cracks and broken places. There was no inspection made concerning the size of the flange of the wheel and the locking rim. G & S simply argues that, having used the rim on its own vehicle, it was believed that the rim was safe.
The fact that G & S did not actually manufacture the wheel and the rim is of no consequence. G & S was a manufacturer. See Radalec, Inc. v. Automatic Firing Corp., 228 La. 116, 81 So.2d 830 (1955); Penn v. Inferno Manufacturing Corp., 199 So.2d 210 (La.App.1967). It did make the pulpwood loader and it did all the things necessary to adapt Spillers' truck for hauling pulpwood. It did supply a tag axle, and it was not required to use a sixteen year old rim on the wheel. There is obvious danger in a defective wheel, particularly when used under such heavy loads as those common on pulpwood trucks and when the tires are inflated on pulpwood trucks, loads which require the inflation of the tire to eighty-five pounds. A manufacturer is presumed to know the vice of the thing he constructs. George v. Shreveport Cotton Oil Co., 114 La. 498, 38 So. 432 (1905); Tuminello v. Mawby, 220 La. 733, 57 So.2d 666 (1952).
A manufacturer is no less a manufacturer because his product is composed in part of units manufacturer by another. Radalec, Inc. v. Automatic Firing Corp., supra. The argument made by G & S would be more impressive if it had purchased the wheel and rim new from a maker on whom it was entitled to rely. The failure to inspect for size the sixteen year old wheel, once purchased from a junk yard, cannot fulfill the responsibility of care which the law places on the manufacturer of an object which, if defective, can reasonably be expected to cause injury.
The liability of Reliable Motors is judged by a different standard:
"The seller who knew not the vices of the thing, is only bound to restore the price, and to reimburse the expenses occasioned by the sale, as well as those incurred for the preservation of the thing, unless the fruits, which the purchaser has drawn from it, be sufficient to satisfy those expenses." (C.C. 2531).
Reliable Motors was a retailer, not a manufacturer. There is no evidence in the record from which we could conclude that Reliable Motors or its employees knew or should have known that this wheel and rim were defective. The record is barren of a standard which Reliable Motors might have applied to determine the safety of the wheel and rim. If there is a standard in the industry, the record does not reflect it. There was no custom of making scientific safety inspections in the trade, on which defendant might have relied.
Louisiana has consistently applied the provisions of C.C. 2531 in limiting the liability of a seller "who knew not the vices of the thing" to a restoration of the purchase price and expenses of the sale.[1] *808 Gordon v. Bates-Crumley Chevrolet Co., 158 So. 223 (La.App.1935); Lesher v. Great Atlantic & Pacific Tea Co., 129 So. 2d 96 (La.App.1961); Jumonville, Liability for Damages Resulting from Consumption of Deleterious Foodstuffs in Louisiana, 22 La.L.Rev. 435, 447 (1962); 42 Tul.L.Rev. 430.
Spillers received injuries to both left and right legs in the accident. There was a compound comminuted fracture of the tibia and a compound fracture of the fibula. Surgical reduction was performed under spinal anesthetic, which gave Spillers the first relief from pain following the accident. He was placed in a long leg cast and was discharged from the hospital after ten days. During that time he received many injections of morphine and pain tablets. He was given medication to prevent tetanus and antibiotic injections every six hours. On June 1 the cast was changed, his stitches were removed and a new cast applied. On June 22 a rubber heel was attached to the bottom of the cast to permit some weight bearing, and he was allowed to use crutches. On August 14 x-rays noted that callus was forming but that there was incomplete healing, so weight bearing on the left leg was eliminated. On September 25 the cast was removed, five months after the injury. On October 28 x-rays showed further, but incomplete healing. On November 25 a limp was noted and x-rays showed that healing was not solid. Spillers was instructed to return to his crutches. X-rays on December 30 showed incomplete healing. There was complaint of pain, and a long leg brace was prescribed. This brace laced above the fracture point, and was designed to allow the use of the leg by minimizing the weight bearing at the fracture site. The delayed union of the bone was attributed to the numerous loose bone fragments. Xrays in February of 1971 showed further healing. Use of the brace was continued. In April of 1971 the healing was still not complete. X-rays of June 9, 1971 showed complete healing, and the brace was removedmore than thirteen months after the injury. In September of 1972, as a result of complaints of pain and locking in the right knee, x-rays discovered bone chips attributed to the accident, which would require further surgery and hospitalization.
In August of 1971 Spillers obtained employment as a timekeeper. He worked about a month because he was unable to move oxygen bottles a duty which was added to his timekeeping duties. Then Spillers attempted to work as a carpenter for one day but couldn't squat down, and consequently was unable to continue that kind of work. He then had a brief period of employment operating a hydraulic log loader. His leg continued to swell and continued to hurt. In March of 1972 Spillers lease two hundred acres of land and went into the dairy business. At the time of the trial Spillers still had trouble walking. There was frequent pain, which prevented his squatting. The left leg continued to swell and he could not move about as well as he could before the accident. He could no longer play ball and could no longer work as much or long as he could before the accident.
*809 The Court of Appeal found that Spillers could have expected to make over $900.00 a month if he had been able to go into the pulpwood business with his truck. At the time of the trial, he had not been in the dairy business long enough to determine what his average monthly earnings would be. In the year preceding the accident, Spillers had built his own home, benefiting himself financially to the extent of $10,000.00.
The Court of Appeal stated that the trial jury had abused the "much discretion" afforded it by article 1934(3) of the Louisiana Civil Code, which provides:
"In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, ..."
The Court of Appeal commenced by finding that $15,000.00 was "proper" for plaintiff's pain, suffering and permanent disability; that $10,000.00 was an appropriate award for "loss of earnings." The judgment was consequently reduced to $28,635.36.
Since the jury does have, under the law, much discretion in fixing damages, a more appropriate method of testing whether the jury had abused its discretion is to determine whether the award of the jury can be supported under the evidence.
For example, there is evidence in the record which would amply support an award for loss earnings for more than $20,000.00. Spillers was incapacitated and unable to work, although he tried, for almost two years after the accident. He could reasonably have expected to earn more than $900.00 a month in the pulpwood business. There is evidence that the plaintiff might have earned much more, if the accident had not occurred.
The Court of Appeal made no finding with respect to the impairment of Spillers' future earning capacity. There is ample evidence which would justify a jury award for the loss of future earnings for this young, industrious man whose earnings depended to a large extent on his physical capacity to work.
We do not agree with the implications of the Court of Appeal in fixing $15,000.00 as a "proper" award for pain, suffering and permanent disability. Evidence on this aspect of the case is voluminous and uncontradicted. A reviewing court might well disagree with the amount of the award fixed by the jury, but it is not entitled to substitute its opinion for that of the trier of fact. Appellate review of awards for damages in the trial court is limited to determining whether the trial court abused its discretion. When a jury fixes an award, and that award is not disapproved by the trial judge, the action of the trial court is entitled to much respect, and should be upset only when it can be demonstrated that the jury abused its discretion. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indemnity Co. of Omaha, 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967); Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Walker v. Champion, 288 So.2d 44 (1973); Fox v. State Farm Mutual Automobile Insurance Co., 288 So.2d 42 (1973).
We cannot say that the jury abused its discretion when it returned an award for $85,000.00, which included compensation not only for loss of earnings in the past, but for pain, suffering, disability and loss of future earnings.
Consequently, the judgment of the Court of Appeal is amended, and the judgment of the district court is reinstated, fixing plaintiff's award in the amount of $85,000.00, plus interest and all costs.
*810 TATE, J., concurs in part and dissents in part.
BARHAM, J., concurs in part and for reasons assigned by TATE, J., dissents in part.
TATE, Justice (dissenting in part).
The writer concurs in the majority opinion insofar as it restores the jury award of damages. However, he dissents insofar as it affirms the dismissal of the suit against Reliable Motors, Inc.
Reliable contracted with G & S Manufacturing Co. to add an additional rear axle. More than one-third of the purchase price was due to modifications of the truck by G & S Manufacturing at the order of Reliable.
The modification of Reliable's truck by G & S was part of a continuing relationship.
Thus, insofar as the defective wheel assembly furnished in connection with the axle installation, Reliable was as much a manufacturer as G & S. Just as large motor companies have some subcontractors fabricate parts of the ultimate vehicle assembled for sale to purchasers, so did Reliable operate in the present and in similar transactions. I see no more reason to exclude Reliable from liability for the defective wheel assembly, and no less, than to do so insofar as G & S is concerned, the fabricator employed by Reliable. See: Penn v. Inferno Manufacturing Co., 199 So.2d 210 (La.App. 1st Cir. 1967), cert. denied 251 La. 27, 202 So.2d 649 (1967).
I would go further. I think Reliable should be held liable for "fault" under Civil Code Article 2315 as the vendor of a defective article foreseeably injuring others. The fault of the retailer is not due to any negligence on his part, but is simply due to his placing into commerce articles which create an unreasonable hazard to others. Strict liability for such fault should be enforced for a retailer of products unreasonably dangerous in normal use, just as it is in Louisiana for manufacturers, Weber v. Fidelity & Casualty Insurance Company of N. Y., 259 La. 599, 250 So.2d 754 (1971), and just as it is in other American jurisdiction for similar reasons, Restatement of Torts 2d, § 402(A) (1965), Annotation, Products Liability, 13 ALR 3d 1957 (1967).
For these reasons, I respectfully dissent from the denial of the coverage to plaintiff against Reliable, although concurring otherwise in the majority opinion.
NOTES
[1] For a suggestion that C.C. 2531 be limited to problems of "obligations of the seller," and not applied to damage suits based on the negligence of the seller, see Crowe, The Fishbone, 19 Loyola L.Rev. 357 (1973). For a theory extending liability of a good faith seller by interpreting the phrase "expenses occasioned by the sale" (C.C. 2531) to include some damages, see Morrow, Warranty of Quality, 14 Tul.L.Rev. 529, 542 (1940).

It is interesting to observe the French resolution of this problem. In 1925 the Court of Cassation held that a manufacturer-vendor of a defective automobile was liable in damages to his immediate vendee, and this sum included what the vendee had to pay the victim of the accident caused as a result of the defect or vice in the thing as an "expense occasioned by the sale." Cass. req., 21 october 1925, S.1925, 1. 198, D.P.1926. 1. 9. Recent French jurisprudence has expanded the provisions of article 1645 of the Code Civil dealing with bad faith sellers, limiting, however, liability for damages incurred as a result of an accident caused by the defect in the thing to "professional" salesmen. This expansive interpretation of article 1645 applies whether or not the vendor has manufactured the object himself. See G. Levy, Recherches Sur Quelques Aspects de la Garantie des Vices Cache dans la Vente des Vehicules Neufs et D'occasion, 68 Rev.trim. dr.civ. 1, 22 and authorities cited therein (1970).