AYRES, Judge.
This action in tort arises out of a motor vehicular accident that occurred about 8:05 p.m. on the dark rainy night of October 26, 1972, in Chauvin “bottom,” between “Red Dog Saloon and Hideaway Road,” in the southbound traffic lane of U. S. Highway 165, about 1.7 miles north of Monroe. Involved were a 1972 model Pontiac automobile operated by Danny M. Thomas and a Chevrolet truck-grain-trailer unit operated by Everett W. Jayroe.
Plaintiffs are Danny M. Thomas, his father, Aubrey M. Thomas, and South Texas Lloyds, insurer of the Thomas Pontiac. Defendants are Jayroe and his liability insurer, Guarantee Insurance Company of Texas.
Both vehicles, together with a third vehicle “sandwiched” between, at the time of the accident, were proceeding southward in the southbound traffic lane of a two-lane asphalt thoroughfare, with defendant’s unit, heavily loaded with rice, in the lead. The accident was precipitated by Jayroe’s truck-and-trailer unit’s experiencing a mechanical breakdown, a rupture of an oil line. It had stopped in the southbound traffic lane and was struck from the rear by the Thomas vehicle, inflicting the injuries and damages for which, by this action, plaintiffs seek to be compensated. The “intervening” vehicle had, in the meantime, passed defendant’s unit.
Danny M. Thomas sought to be compensated in damages for his personal injuries sustained in the accident, for his loss of earnings, and to be reimbursed for hospital and medical expenses incurred in the treatment of his injuries. Aubrey M. Thomas sought the recovery of $50.00, representing the deductible amount of property damage not covered by his collision insurance policy. The insurer, South Texas Lloyds, sought recovery of the sum of $2,730.14, representing the net amount of the property damage sustained to the Thomas automobile to which it had become subrogated.
There was judgment in favor of Danny M. Thomas for $800.00 for loss of wages, $393.33 for medical expenses, and $3,500.-00 for pain and suffering sustained by virtue of the accident. Aubrey M. Thomas and South Texas Lloyds recovered judgment in the amounts and for the purposes hereinabove stated. From the judgment thus rendered and signed, the" defendants, Everett W. Jayroe and Guarantee Insurance Company of Texas, appealed.
Danny Thomas has answered this appeal and prayed that the judgment in his favor be increased to the principal sum of $13,878.33, plus interest and costs.
Negligence charged to Jayroe consisted of blocking, with his truck-and-trailer unit, a heavily traveled highway where a shoulder was available for stoppage, by failing to maintain a proper lookout, by creating a dangerous trap for overtaking motorists, by not taking precaution to warn approaching traffic of the presence of his obstructing equipment on the highway, and by not directing traffic around his unit during a heavy rain in the darkness of the night when visibility was limited.
Negligence charged to Jayroe was denied by defendants who charged Danny Thomas with negligence allegedly constituting the sole and proximate cause of the accident, or, in the alternative, contributing thereto in that he failed to maintain a proper lookout or to have his car under control, and in traveling at an excessive speed, in view of the circumstances, and thereby running into the rear of defendant’s disabled unit.
*397 By rendition of the judgment, the trial court obviously concluded Jayroe was guilty of negligence constituting the sole, proximate cause of the accident and that plaintiff Danny Thomas was free from negligence. The correctness vel non of his honor’s conclusions must be determined on a basis of the facts disclosed by the record and of the law applicable thereto.
First, appropriate for consideration is the fault or negligence vel non of defendant Jayroe who was an experienced motor-vehicle mechanic and an operator or driver of motor vehicles spanning a period exceeding 30 years. He was familiar with the route where the accident occurred. He recognized, at the time of mechanical failure of his equipment, the dangers inherent in stopping upon and blocking the entire southbound traffic lane, particularly in the nighttime during a heavy rain when visibility was limited. The weather conditions then prevailing were obvious to him. He had been driving in the rain most of the day. He had, moreover, observed, only a mile or so back up the road, the dangers experienced by another motor vehicle which, for some unknown reason, had ventured upon the shoulder of the road softened by the continuous rain. Consequently, not finding it feasible to steer his unit off the main portion of the highway to the shoulder, Jayroe elected to let his unit stop and remain on the travel-portion of the highway.
Had Jayroe not known before stopping, he soon learned or recognized, or should have seen and recognized, the" absolute necessity for the utmost vigilance in protecting his unit and warning traffic of its presence on the highway. Immediately upon alighting from his vehicle after it became disabled, Jayroe found it necessary to warn and direct, with a flashlight, some six or seven cars around his own vehicle. By the time he obtained from his vehicle some tape with which he was to attempt to temporarily stop the oil leak, he again had to direct a number of other cars around his vehicle. Nevertheless, with knowledge of the necessity for constant vigilance obtained at least by the passing of the many vehicles whose passage he had to direct, he placed no flares or other signals or devices to warn traffic while his presence and attention were diverted from the highway in an effort to repair the oil line. To proceed with that undertaking, he raised the hood of the motor of his truck and climbed upon the motor to begin the repairs on the line located, as we understand it, near the rear of the motor. However, before the repairs were actually begun, Thomas’ vehicle crashed into the rear of defendant’s unit.
Defendant Jayroe had flares in his truck available for his use under circumstances such as existed at the time of the accident. Nevertheless, he made no attempt, nor did he intend, to use them on that occasion. He took a chance which was obvious, or should have been obvious, to one with his experience. His belief that he could repair the oil line and move on before the approach of other traffic was without any foundation. His apparent belief there would be no further approaching traffic was delving into the unknown. He had every reason to believe the approach of other traffic was imminent. His actions under the conditions and circumstances shown to exist at the time of the accident constituted negligence of the grossest character. Jayroe’s aforesaid actions were not in keeping or in compliance with the provisions of the Highway Regulatory Act, LSA-R.S. 32:1 et seq., particularly the provisions of Section 141 thereof, relating to the stopping, standing, or parking of vehicles on an open highway. This section of the statutes provides:
“A. Upon any highway outside of a business or residence [sic] district, no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main traveled part of the highway when it is practicable to stop, park or so leave such *398 vehicle off such part of said highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicles shall be available from a distance of two hundred feet in each direction upon such highway.
“B. The provisions of this Section shall not apply to the driver of any vehicle which is disabled while on the main traveled portion of a highway so that it is impossible to avoid stopping and temporarily leaving the vehicle in that position. However, the driver shall remove the vehicle as soon as possible, and until it is removed it is his responsibility to protect traffic.
“C. The driver of any vehicle left parked, attended or unattended, on any highway, between sunset and sunrise, shall display appropriate signal lights thereon, sufficient to warn approaching traffic of its presence. (Emphasis supplied.)
Jayroe failed to comply with the requirements of the statute in these nonexclusive particulars: He left no unobstructed portion of the highway for the free passage of southbound traffic; nor did he display any signal lights to warn approaching traffic of the presence of his vehicular unit on the highway; nor did he discharge his responsibility to protect the traffic on the highway at the scene of the accident. That the defendant truck driver, Jayroe, was guilty of negligence in the aforesaid respects is clear, and this negligence was a proximate cause of the accident.
In Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298, 303-304 (1962), it was held that the driver of a tractor-trailer unit who failed to set out signal flares when his tractor became disabled and stopped on the travel portion of a highway, about noontime on a rainy day, was guilty of negligence which proximately caused a rear-end collision when the overtaking truck driver failed to see the stalled vehicle in time to stop when he was unable to pull into the left lane because of a passing automobile. The court observed:
“The display of the signal flags at a specified distance from the vehicle is designed not only to warn of the presence of a vehicle on the highway, but also to give notice to all approaching traffic that the vehicle is stationary. A stationary vehicle and a moving one require different driving actions by an overtaking motorist. A momentary delay in the recognition that a vehicle is stationary may create a dangerous traffic situation. The signal is designed to arrest the attention of all approaching drivers — even an inattentive one.”
Thus, the placement of the warning flares or devices would have served as an advance warning that a stationary vehicle was on the highway ahead and constituted an obstruction to traffic. We can only reasonably infer in the instant case, as was done in the Dixie case, that the collision would not have occurred if the statutory precautions to protect approaching traffic had been taken. The statute with which we are dealing is a mandatory statute and gives those coming within its purview no choice as to whether they should comply with its terms. Badeaux v. Patterson Truck Line, Inc., 247 So.2d 875 (La.App., 3d Cir., 1971 — writ refused); Womax v. Earl Gibbon Transport, Inc., 226 So.2d 573 (La.App., 4th Cir., 1969); Hogan v. Travelers Insurance Co., 211 So.2d 704 (La.App., 4th Cir., 1968).
The evidence leaves no room for doubt that Jayroe’s failure to take the precautions required by the statute constitutes an approximate, direct legal cause in fact of the accident and of the damages resulting therefrom.
While the courts in the cited cases were concerned with the provisions of a preceding highway regulatory act, the principles involved are applicable to the facts here *399 when gauged by the provisions of the present statute. The conclusion, to us, is inescapable that Jay roe’s failures, as set forth hereinabove, especially in view of the magnitude of the dangers inherent in his failures, constitute negligence of the grossest kind, with a direct causal connection with the occurrence and without which the accident would not have happened.
The facts relating to the occurrence of the accident, from the viewpoint of plaintiff Danny Thomas, may now be briefly reviewed. Thomas left his residence somewhere north of the scene of the accident about 8:00 p. m. en route to Monroe to attend a football game at Neville High School. From the, time he entered the highway at a point approximately two miles from the scene of the accident, Thomas was preceded by another car both of which were traveling at a speed of approximately 40 miles per hour. In the meantime, Thomas had not seen, and consequently did not know, the car preceding him was itself preceded by defendant Jayroe’s truck-and-trailer unit. Both were proceeding in a normal manner when suddenly the immediately preceding vehicle swerved to the left as if to begin a passing maneuver and disclosed to Thomas, for the first time, defendant’s vehicle, which first appeared to be moving down the road but at a slower pace. Soon, however, Thomas realized the unit had stopped; the preceding car barely succeeded in its passing maneuver because of the approach of oncoming traffic. The approach of this traffic, however, precluded Thomas from making a similar movement, and the inevitable crash of the front of Thomas’ vehicle into the rear of defendant’s unit occurred. Thomas saw no flares or other devices warning of the truck unit’s presence on the highway. As the crash occurred, he noticed the reflectors on the trailer.
Prior to the collision, S. H. Bowie, Jr., a trooper with the Louisiana State Police, while en route from the north to Monroe, saw defendant’s unit stopped on the highway. Unable to give assistance, he notified his headquarters in Monroe by radio of the presence of the vehicle on the highway. Thereupon, Sgt. Jerry W. Durham of the police department was dispatched to the scene. The accident occurred while the sergeant was en route. Thomas testified that he first saw defendant’s truck, after the car preceding him had pulled to the left, at a distance of some six car lengths away; he thereupon applied his brakes and attempted to stop.
The physical facts belie the correctness of Thomas’ testimony that his vision was reduced to only 15 feet. This is unrealistic, as appears from all the testimony with respect to the passing motorists, the trooper who passed the scene before the occurrence, and the sergeant who arrived and investigated the accident. The trooper’s estimation of his own speed was approximately 40 miles per hour.
In Vowel v. Manufacturers Casualty Insurance Co., 229 La. 798, 86 So.2d 909, 913 (1956), in which there was a lumber truck stopped in the roadway next to a milk truck for a period of four-to-five minutes without visible lights, the Supreme Court held that the driver of the overtaking car was not guilty of contributory negligence because oncoming traffic prevented a passing movement. There it was stated:
“Our rule that a motorist traveling on the public highways after dark or during a rainstorm, fog, or other abnormal condition, which prevents him seeing ahead, except imperfectly, and for a short time and distance, must guard against striking objects in the road with which he may be suddenly confronted, constitutes an exception to the general rule that a motorist may assume that the road is safe for travel even at night. But that exception to the general rule is itself subject to the exception that a motorist traveling by night is not charged with ■the duty of guarding against striking an unexpected or unusual obstruction, which *400 he had no reason to anticipate he would encounter on the highway. Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L.R.A. 1917F, 253; Kirk v. United Gas Public Service Co., 185 La. 580, 170 So. 1.” (Emphasis supplied.)
Cited by the court in the Vowell case was that of Gaiennie v. Cooperative Produce Co., 196 La. 417, 199 So. 377 (1940), which involved a truck parked on the dirt shoulder of a paved highway with one of its front wheels resting on the shoulder and the other front wheel and both rear wheels resting on the pavement. The body of the truck extended at an angle across the right traffic lane about five feet from its outer edge, with no lights or flares to warn motorists of its presence. Plaintiff therein was proceeding along this partially blocked traffic lane when the parked truck suddenly loomed out of the darkness and, because of traffic approaching from the opposite direction, the driver had no alternative but to apply his brakes, but, being then too close, he was unable to avoid running into the rear end of the parked truck. The Supreme Court held that the plaintiff was not negligent in failing to see the truck sooner than he did under the prevailing circumstances.
In the case of Dodge v. Bituminous Casualty Corporation, 214 La. 1031, 39 So.2d 720 (1949), the Supreme Court held a motorist traveling on a straight highway at 45 miles per hour on a dark evening free from negligence for his failure to see a darkened truck until he was almost upon it, and who was unable to take the risk of passing to his left due to oncoming traffic. There it was held he had no reasonable alternative but to strike the parked vehicle.
 Contributory negligence is, as the phrase signifies, negligence which contrib-utés to an accident, that is, negligence having a causal connection therewith and but for which the accident would not have occurred. Viewing the facts in the light of the aforesaid principles of law, we not only find no error in the trial judge’s conclusions that Danny Thomas was not only free from fault, either directly or contribu-torily, in the occurrence of the accident but, from our independent review of the facts and the law applicable thereto, conclude that his findings were eminently correct.
The defenses and demands of the defendants, predicated upon a finding of negligence on the part of Danny Thomas, plaintiff-driver, are untenable. The findings of the trial court, with which we are in accord, were that this plaintiff was not guilty of negligence; hence no purpose could be served by their further discussion.
Lastly, however, for consideration is the matter of the award of damages to plaintiff Danny M. Thomas. This plaintiff contends that the award is inadequate and should be increased. Defendants’ position is that the award is excessive and should be reduced. Complaint is directed primarily to the award of $3,500.00 for pain and suffering.
With respect to plaintiff’s injuries, the report of Dr. C. C. Kemp of the Wright & Kemp Clinic, Monroe, Louisiana, discloses that plaintiff Danny Thomas was seen by Dr. Wright soon after plaintiff’s admission to the St. Francis Hospital about 8:40 p. m. on the day of the accident. Plaintiff gave a history of having been injured in a motor-vehicular rear-end collision. An examination revealed plaintiff had sustained a severe laceration of the right eyelid and brow. From x-rays made at the time, it was determined plaintiff had sustained fractures from the fourth through the seventh ribs on the left side, with an incomplete fracture of the third rib. Plaintiff was seen by Dr. Kemp the following morning. The severe pain of which he complained the night before in his chest and eyebrow had continued but had moderated. Plaintiff remained in the hospital for a period of two days. Upon release, he was placed in a rib cage, advised to limit his activities, and to return in three days for removal of sutures.
*401 On the occasion of two other visits to his doctor, plaintiff continued to complain of mild pain in the left side of his chest and in his eyebrow. The chest pains were said by the doctor to have been activated by exertion and accentuated by respiration. Plaintiff was thereupon referred to Dr. Don Phillips, a local ophthalmologist, for evaluation of a neuritic-type pain. This doctor concluded that plaintiff had possibly sustained a severance of the trigeminal nerve. He was apparently relieved from the pain due to this condition by a series of B-12 shots and vitamins. Despite the continuance of aggravating chest pains on December 29, 1972, plaintiff appeared asymptomatic as to his chest injury. The rib fractures were healing satisfactorily. However, on January 9, 1973, plaintiff continued to complain of pain, numbness, and parethesia in the forehead above the lacerated area. An examination by Dr. Kemp under date of June 6, 1973, disclosed that the laceration had healed with no adverse cosmetic effect. However, plaintiff gave a history of persistent numbness, par-ethesia, and itching over the supra-orbital area supplied by the superior portion of the trigeminal nerve and the supra-orbital nerve. Sensation testing by pinprick revealed an area of anesthesia nine centimeters laterally and seven centimeters vertically above the eyebrow. No sensation was present in that area; pain perception was absent.
There were no complaints on June 6, 1973, of chest pain or difficulties as a result of the accident other than the numbness and tingling of the forehead, which it was said, might persist for months, years, or permanently. Whether the peripheral nerves would unite and heal and the condition produced be completely relieved was described as a matter completely unpredictable.
As again emphasized by the Supreme Court in Donald Ray Spillers v. Montgomery Ward & Company, Inc. et al, bearing Nos. 54029 and 54030 (not yet reported), 294 So.2d 803:
“A reviewing court might well disagree with the amount of the award fixed by the jury, but it is not entitled to substitute its opinion for that of the trier of fact. Appellate review of awards for damages in the trial court is limited to determining whether the trial court abused its discretion. When a jury fixes an award, and that award is not disapproved by the trial judge, the action of the trial court is entitled to much respect, and should be upset only when it can be demonstrated that the jury abused its discretion.” (Emphasis supplied.)
See, also: Fox v. State Farm Mutual Automobile Insurance Co., 288 So.2d 42 (La., 1973); Walker v. Champion, 288 So.2d 44 (La., 1973); Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967); Ballard v. National Indemnity Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963).
The trier of fact in the instant case was the district court judge. The aforesaid rule is equally applicable to his findings as to those of a jury.
The record, in our opinion, discloses no facts which demonstrate that the court abused its discretion. Nor do we find any manifest error with respect to the court’s conclusion relative to plaintiff Thomas’ possible losses from prospective earnings.
The judgment appealed is accordingly affirmed at defendants-appellants’ costs.
Affirmed.