370 So.2d 1305 (1979)
Mrs. Georgia Nettie CLOFORT
v.
MATMOOR, INC. and United States Fidelity & Guaranty Company.
No. 9950.
Court of Appeal of Louisiana, Fourth Circuit.
April 11, 1979.
*1306 Schroeder, Kuntz & Miranne, Herman M. Schroeder, New Orleans, for plaintiff-appellee.
Chaffe, McCall, Phillips, Toler & Sarpy, Charles L. Chassaignac, New Orleans, for defendants-appellants.
Before SAMUEL, BEER and GARRISON, JJ.
GARRISON, Judge.
Mrs. Georgia Colfort sued her former landlord, Matmoor, Inc., and its insurer for injuries received when she fell down the back steps of the premises at 6019 Bienville Street, New Orleans. After judgment for plaintiff in the amount of $47,413.30, defendants have appealed on the issues of liability and quantum.
The evidence showed that Mrs. Clofort fell when a wooden stair tread broke as she stepped on it. Defendants attempt to escape the general liability imposed on owners and lessors under La.Civ.Code Arts. 670, 2322 and 2695[1] by referring to La.R.S. 9:3221,[2] which allows the lessor to limit contractually his liability for defects in the leased premises. To evidence plaintiff's alleged assumption of responsibility, defendants introduced a copy of the rental receipt booklet the Cloforts received when they first rented the premises. Printed on the cover of that booklet are the following statements:
"All rents payable in advance.
"Late payments subject to extra charge of 10% if over 5 days delinquent.
"30 days notice must be given when vacating.
"Premises must be left broom swept clean.

*1307 "This book is your receipt; bring it with you when making payments. If lost, there will be a charge of 50¢ for a duplicate.
"Tenant responsible for all damage other than normal wear and tear.
"No liability will be assumed by this office.

"Tenants must notify office in writing of any defects, or necessary repairs." (Emphasis added.)
Defendants admitted that the premises were rented under an oral month-to-month agreement, but contend that the printed stipulations on the rental receipt booklet constituted part of the terms of the agreement and an assumption of responsibility by the tenant under R.S. 9:3221.
The contract contemplated by R.S. 9:3221 may be either oral or written, but the defendants have the burden of proving with legal certainty the existence of such a contract. Phillips v. Cohen, 183 So.2d 473 (La.App. 4th Cir. 1966); Roppolo v. Pick, 4 So.2d 839 (La.App.1941). Defendants have failed to produce any proof that plaintiff or her husband agreed to assume any responsibility for defects in the premises. The testimony showed that plaintiff and Mr. Clofort had painted the interior of the apartment themselves immediately after moving in, but that their landlord had supplied the paint. When they had plumbing problems, the landlord had sent out a plumber and paid for the repairs. The day after plaintiff fell on the back steps, the landlord sent a carpenter to repair the broken step and paid for the repairs. There is no evidence that plaintiff and Mr. Clofort ever made any agreement to maintain the premises. There is no evidence that the lessor or its agent, Louis Hufft, ever called plaintiff's or Mr. Clofort's attention to, or explained to them, the stipulations on the rental receipt book. The facts in this case are well-described by the following excerpt from Roppolo v. Pick, supra:
"[A]s disclosed by the record, no discussion was had, nor was any notice or warning, verbal or otherwise, directed to the lessee to the effect that the receipts embodied a special contract between them. Defendant must necessarily rely entirely upon the silent delivery and acceptance of the rent receipt to sustain her contention that such a stipulation constituted a contract between them.
"From the circumstances of the transaction, lessee unquestionably had the right to regard this rent receipt simply as a receipt or voucher, evidencing payment of the first monthly rental. No stipulation or agreement was entered into, and much less was there ever an understanding between lessor and lessee, that the rent receipt, with its inscription, would constitute a special contract between them and intended, as such, to serve that particular purpose. We are satisfied that such a voucher, or receipt, with its inscription, does not give rise to a contract between the parties and thereby impose upon the lessee the assumption of risk urged by defendant." 4 So.2d at 842.
We conclude that defendants have failed to prove the existence of a special contract by which the tenant assumed responsibility, and therefore R.S. 9:3221 is not applicable. Accordingly, we find that defendants are liable for plaintiff's injuries under Civ.Code Arts. 670, 2322 and 2695.[3]
Three doctors testified regarding plaintiff's injuries. Dr. Kenneth Kemmerly, plaintiff's gynecologist, testified that she came to him three days after her fall, complaining of pain, and upon examination he noted an abrasion on her back at L-4 and L-5 and tenderness. He prescribed Valium as a muscle relaxant. When she returned a week later, complaining that her back was still bothering her, examination of the low back area revealed acute spasm of the back. He prescribed an additional painkilling muscle relaxant, Wygesic, and advised her *1308 to seek treatment from Dr. Courtney Russo, an orthopedist. Dr. Kemmerly also ordered lumbosacral spine X-rays, which showed lumbosacral spine to be within normal limits. Dr. Kemmerly could not remember whether she complained about the cervical area at that time. She did not return to him after that second visit.
Acting on Dr. Kemmerly's referral, plaintiff made an appointment with Dr. Russo, who subsequently became her treating physician for the back injury. Dr. Russo testified that his initial examination revealed spasm in the paravertebral muscles, diminished sensation on a portion of the left side, and weakness in the extensor tendon of the left big toe. Dr. Russo's initial impression was a probable herniated disc at L-4 and L-5. At his recommendation, plaintiff was hospitalized for traction and evaluation for twenty-two days. A lumbar myelogram taken during that time was normal. Clinical diagnosis was acute lumbar strain and coccydymia; the medical records show that prior to entering the hospital she had been experiencing bowel and urinary difficulties, pains in her legs and toes, and episodes of nausea and vomiting. Dr. R. L. Strub, a neurologist called in on consultation by Dr. Russo, apparently found no neurologic deficits, recommended physical therapy and restraint in the use of painkilling and tranquilizing medications. She received physical therapy and, after discharge, was fitted with a lumbosacral corset. She was placed on various types of medications, including Valium, Fiorinal and Placidyl. She was sent home to complete bed rest for four to six weeks.
On a follow-up visit one-and-one-half months after discharge, Dr. Russo found plaintiff still had a lessening of sensation at L-4 and L-5 levels, which, the doctor stated can be associated with a ruptured disc. She also had muscle spasm in the lumbar region. The doctor prescribed heart treatments and rest.
By December 1975 (approximately three months post-hospital) plaintiff's main complaints were headaches, which Dr. Russo attributed to neck problems related to her fall. He referred her to Dr. Daniel Trahan, a neurologist. Dr. Trahan examined plaintiff only once, in February 1976. He testified that she complained of nausea, blurred vision, neck tenderness, and intermittent pain in the lower lumbar area. His examination revealed mild paravertebral and trapezius spasm, particularly in the muscles on either side of the neckbone spreading out into the shoulder region. Plaintiff's surgical spine X-rays were returned as normal. Dr. Trahan concluded that plaintiff's headaches were cervical in origin and muscular in nature, related to chronic paravertebral spasm and resulting from her fall the preceding July. He found no evidence of neurological back problems, but stated that he had been looking only for problems related to her headaches. He did not examine her back. He admitted that a patient can show a negative syndrome which later develops into a positive syndrome. He prescribed Valium and heat treatments.
Mrs. Clofort continued afterwards to be treated by Dr. Russo. She visited him in March, July, August and October of 1976. On each visit she consistently complained of headaches, neck pain and back pain. Dr. Russo concluded that her headaches emanated from the cervical rather than the lumbar region, and diagnosed a cervical strain with a root syndrome (pinched nerve). He continued treatment by heat massage and medication, including Valium, Fiornal, and Percodan. He also prescribed use of an orthopedic collar for an unspecified time.
After her visit to Dr. Russo in October 1976, plaintiff did not return to him for over a year. She testified that although she still had pain, she had moved out of town and it was too long a drive for her to make without discomfort. She stated that she continued to suffer pain, intermittently and in varying degrees, during this time, but that she had discontinued the physical therapy sessions because she could not afford them. There was some testimony to indicate that she had been treated by a Dr. Bertucci during this year, but he did not testify at trial.
In October 1977, plaintiff returned to Dr. Russo. (This visit was made two months *1309 before the trial, and was the last time she saw him before trial.) She complained of pain in her neck and between her shoulders, occasional numbness and weakness in the left upper extremity, and pain in the lumbosacral region radiating down into the left buttock, with some spasm and pain in the cervical region on extremes of flexion and extension. Dr. Russo testified that these symptoms indicate a lumbar problem. Plaintiff still suffered some numbness in the left big toe, and differentials between the right and left leg on straight leg raising indicated to Dr. Russo a nerve root involvement in the area of the fourth disc or the third nerve root. He diagnosed this as a "disruptured" disc or "soft" disc, in which periodically bulges and presses on the nerve and then moves back into place. Based on her history during the two-and-one-half-year period between her injury and the trial, Dr. Russo concluded that plaintiff will have intermittent pain for most of her life. He estimated that she had a three to five percent permanent disability of the whole body, and that the only relief, other than continued heat treatments, massage and periodic medication, would be surgery, if indicated in the future.
Based on Dr. Russo's testimony, the trial judge found that plaintiff suffered long-standing cervical and lumbar injuries which she would continue to suffer for the rest of her life on an intermittent basis, and that she had a three to five percent permanent disability of the whole body. In assessing damages for pain and suffering, the judge considered Mrs. Clofort's twenty-two-day hospitalization in 1975, that she had to wear an orthopedic corset for approximately a year, that she had to wear an orthopedic collar for some time, and also that her objective symptoms were still manifest over two years post-accident. He also considered her age at time of trial (39) and noted that she was a "small, slight, energetic-type of person, whom the evidence indicates was a very active type of person." Accordingly, he awarded her $45,000 for pain, suffering, and permanent disability ($20,000 for past pain and suffering, $25,000 for future pain, suffering and permanent disability).
Defendants allege error in the trial court's finding that plaintiff had sustained an injury of a longstanding and continuing nature. It is well-settled that factual conclusions of the trial court should not be disturbed absent a finding of manifest error. Canter v. Koehring Co., 283 So.2d 716 (La.1973). The Canter standard of review has since been clarified by Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Under the Arceneaux guidelines, the appellate court cannot simply find a "reasonable basis" for the trial court's findings, but rather it must determine that "the record establishes that the finding is not clearly wrong (manifestly erroneous)." 365 So.2d 1333. Our review of the record convinces us that the trial judge committed no manifest error in finding that plaintiff's injury was long-standing and continuing. His finding is well-supported by Dr. Russo's testimony as well as by plaintiff's, and we see no convincing evidence against it. Dr. Russo's testimony certainly must be given great weight, for he is the only physician who saw plaintiff regularly and repeatedly between the accident and the trial. That Mrs. Clofort's pain may now have become "intermittent" does not mean that it is not "continuing." Dr. Russo testified that she would likely have flare-ups of pain on and off for the rest of her life.
Defendants have also appealed on the question of quantum. They contend the $45,000 amount was an abuse of discretion and that $15,000 was the most that should have been awarded.
"The courts of appeal have a constitutional duty to review the law and facts and thereafter render a judgment of quantum based on the merits, determining whether the jury has abused its `much discretion' that the law accords it in awarding damages. [Citations omitted.] Before an appellate court can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. [Citations omitted.] In the event the appellate court finds from the record an abuse of discretion, the award may be disturbed by lowering it to the highest *1310 point which is reasonably within the discretion afforded the trier of fact. [Citations omitted]."
Wilson v. Magee, 367 So.2d 314 at 315 (La.1979).
See also, Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Our role in review of quantum, as jurisprudentially interpreted, is to determine an abuse of discretion not so much by reference to similar cases (for only "truly similar" cases should be considered), as by consideration of the particular facts and inferences to be made in each case. See Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974); Coco v. Winston Industries, Inc., supra; Boutte v. Hargrove, 290 So.2d 319 (La.1974). The trial court's "great discretion" is wide indeed, and an appellate court cannot disturb an award simply because the appellate court would have awarded a lesser or greater amount. Coco v. Winston Industries, Inc., supra; Spillers v. Montgomery Ward & Co., Inc., 294 So.2d 803 (La.1974); Bitoun v. Landry, 302 So.2d 278 (La.1974).
Considering these principles, and based on our review of the record, we do not think the trial judge abused his discretion in awarding plaintiff $45,000 for past and future pain and suffering and disability. While this amount must be considered to be on the high end of the spectrum, we believe the record supports the trial judge's decision. Considering plaintiff's age, her lengthy hospitalization, the continued manifestation of pain and other symptoms prior to trial, the inconveniences plaintiff suffered in wearing orthopedic devices and in having to take pain medication so constantly, the limitations that will be placed on her by her future disability, and last but not least, the factors of rampant economic inflation, we do not consider $45,000 general damages to be an abuse of discretion.
For the above reasons, the decision of the trial court is affirmed.
AFFIRMED.
BEER, J., dissents and assigns reasons.
BEER, Judge, dissenting.
I respectfully dissent from the affirmation of the quantum award.
The majority characterizes the award as "on the high end of the spectrum" but concludes that the record supports the trial judge's decision. I disagree. In my view, the award represents a clear abuse of discretion. I believe that the "high end of the spectrum" should be $15,000.
NOTES
[1] "Art. 670. Every one is bound to keep his buildings in repair, so that neither their fall, nor that of any part of the materials composing them, may injure the neighbors or passengers, under the penalty of all losses and damages, which may result from the neglect of the owner in that respect."

"Art. 2322. The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
"Art. 2695. The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same."
[2] "The owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time." R.S. 9:3221.
[3] Plaintiff and Mr. Clofort were not married to each other at the time they rented the apartment, and the evidence is not clear as to whether only one of them, or both of them, were the lessees under the oral month-to-month agreement. Thus, we do not base our finding of liability solely on Art. 2695, since it is not clear that Mrs. Clofort is actually the lessee, she may instead be a third party.