502 So.2d 209 (1987)
Adrian M. LACOUR, Plaintiff-Appellant,
v.
The TRAVELERS INSURANCE COMPANY, et al., Defendants-Appellees.
No. 86-187.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1987.
Bennett, Bennett and Bennett, William J. Bennett, Marksville, for plaintiff-appellant.
Gist, Methvin, Hughes & Munsterman, Dewitt T. Methvin, Jr., Alexandria, for defendants-appellees.
Before DOMENGEAUX, GUIDRY and KNOLL, JJ.
*210 DOMENGEAUX, Judge.
This appeal arises out of a vehicular collision. The record reflects that on April 17, 1984, plaintiff drove Lawrence Jones to Bunkie to rent a Jartran truck so that Jones could haul away lumber salvaged from plaintiff's nightclub in Mansura which had recently burned. After renting the truck, Jones agreed to take the truck to the home of plaintiff's sister in Marksville to pick up a refrigerator to put in one of plaintiff's nightclubs. While plaintiff's automobile was stopped in the roadway behind an automobile wishing to make a left turn, Lawrence Jones struck the plaintiff's vehicle from the rear in the Jartran truck he was operating. According to Jones, he attempted to stop the truck but was unable to do so because the brakes failed.
Plaintiff instituted this suit against Jartran, Inc. and its insurer, The Travelers Insurance Company, Lawrence Jones, and plaintiff's UM carrier, State Farm Mutual Automobile Insurance Company. Plaintiff thereafter amended his petition by adding Jones' liability insurer, Dairyland Insurance Company, as an additional defendant.
Prior to trial, plaintiff dismissed defendants Jartran, Travelers, Jones, and Dairyland, with prejudice, but reserved his rights against State Farm. On December 13, 1985, a twelve-person jury returned a unanimous verdict finding Lawrence Jones negligent and that his negligence was a legal cause of the damages suffered by plaintiff. The jury awarded damages for past and future medical expenses of $18,500.00, and an additional $10,000.00 for all other items of damages. By judgment signed January 3, 1986, the district judge recognized that $20,000.00 had been previously received by plaintiff through compensation and settlement[1] and held State Farm liable for the remaining sum of $8,500.00 under its uninsured motorist provision.
From this judgment, plaintiff has appealed asking that the $10,000.00 award of general damages be increased and for State Farm to be assessed penalties and attorney's fees. Defendant has answered this appeal to ask that the medical expenses award of $18,500.00 be reduced to $6,910.52.
We first address the plaintiff's contention of whether the jury abused its discretion in awarding only $10,000.00 in general damages to Mr. Lacour.
The standard of appellate review of awards for damages was set out by the Louisiana Supreme Court in Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976), as follows:
"We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. Anderson v. Welding Testing Laboratory, Inc. [304 So.2d 351 (La. 1974)], supra; Bitoun v. Landry [302 So.2d 278 (La.1974)], supra; Fox v. State Farm Mutual Automobile Ins. Co. [288 So.2d 42 (La.1973)], supra; Walker v. Champion, [288 So.2d 44 (La. 1973)], supra. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Bitoun v. Landry, supra; Spillers v. Montgomery Ward & Company, Inc. [294 So.2d 803 (La.1974) ], supra. It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."
*211 The record indicates that the plaintiff, Mr. Lacour, is thirty-eight years old and owns at least one nightclub. Prior to this accident, he did part-time work as a painter and sheet rock finisher. According to his testimony, the injuries he received have affected his work as a painter in that he has not been able to paint since the accident. In addition, the record reveals that plaintiff has been involved in at least two previous accidents where he sustained injuries to either his neck or right leg. On May 14, 1969, plaintiff was involved in a train accident in which he broke his right leg and half of his right foot was amputated. Plaintiff sustained no injury to his right knee as the leg was broken below the knee. In 1981, plaintiff injured his neck while working as a painter. According to plaintiff, he was carrying two five-gallon buckets of paint up a flight of stairs when he stepped in some sheetrock mud and fell down. After both accidents, plaintiff recovered and was able to return to work as a painter.
In connection with the alleged injuries Mr. Lacour sustained in this accident, he sought the services of Dr. Ray J. Beurlot, Jr., an orthopaedic surgeon who had previously treated him for a left knee injury. At his first visit on May 3, 1984, plaintiff complained of discomfort in his neck, shoulders, and right knee. After an examination of plaintiff, Doctor Beurlot prescribed steroids for one week and exercises and the use of a heating pad for both his neck and right knee. On May 10, 1984, plaintiff returned to Doctor Beurlot and claimed that his knee had been "giving out." Doctor Beurlot indicated that plaintiff may have to undergo a surgical procedure known as an arthoscopy to determine the cause of plaintiff's increased discomfort. Doctor Beurlot performed the surgery on July 9, 1984 as plaintiff's condition had not improved. The arthoscopy revealed a torn cartilage which Doctor Beurlot repaired during the surgical procedure.
Plaintiff returned to Doctor Beurlot five times following his surgery, each time claiming the condition of his knee was improving. By plaintiff's last visit on December 6, 1984, Doctor Beurlot testified that plaintiff stated he was doing well and that he was relatively pain-free. In addition, plaintiff claimed the knee was better than prior to surgery.
According to Doctor Beurlot, plaintiff would be able to do most anything; however, those activities involving extreme flexion would have to be done in moderation or with care such as climbing, squatting or kneeling. It was Doctor Beurolot's opinion that someone with a torn cartilage such as plaintiff's would have a ten to fifteen percent permanent partial impairment to the right knee. He stated, however, that this is "... a medical impairment and would have different applications in the realm of disability."
For his neck injury, Doctor Beurlot suggested that plaintiff see Doctor Patton or Doctor Fresh, both of whom are neurosurgeons. Plaintiff instead went to Dr. Kenneth E. Vogel, a neurologic surgeon who had previously treated plaintiff in 1983. Doctor Vogel examined the plaintiff and found tenderness in the neck area, mild muscle spasms, and a mild limitation of motion involving the flexing of the neck. Doctor Vogel's initial treatment of plaintiff's condition included medication and physiotherapy.
Two months later, Doctor Vogel renewed the treatment outlined above after plaintiff related continued pain in the neck and arm. When plaintiff returned to the office six weeks later, his condition had not improved and Doctor Vogel recommended that he be hospitalized for further evaluation.
In the hospital, plaintiff underwent a complete medical examination. In addition, a myelogram and a cervical discogram were performed, neither of which indicated a problem area. Plaintiff returned to the hospital in January, 1985, for a cervical facet anthrogram. This test was positive, thus indicating that plaintiff had legitimate joint problems in the neck. He was thereafter given the option of undergoing a surgical procedure known as a neurotomy or to continue therapy, of which he chose to *212 continue with the therapy. According to plaintiff, he has not opted for the neurotomy because he does not have the money to pay the hospital bills. Doctor Vogel stated in his deposition that if the neurotomy is performed, his prognosis is that plaintiff "... would resolve 80 or 90 percent of his pain and return to gainful employment."
Plaintiff was also seen by Dr. C.W. Lowrey, another orthopaedic surgeon. He was oriented to the plaintiff's medical condition and stated that plaintiff continually has pain in his neck and takes two pain pills every night. Doctor Lowrey conducted a physical examination of plaintiff which revealed tenderness in the mid portion of the neck and no appreciable muscle spasms in the upper part of his body. In evaluating plaintiff's knees, he noted that there was tenderness in the medial joint line, but no fluid was in the knee joint. Doctor Lowrey, however, stated that plaintiff's impairments could not be traced solely to this accident as plaintiff has had numerous accidents in the past.
The jury evaluated plaintiff's claims in light of the evidence adduced at trial which included the doctors' video depositions and awarded $10,000.00 in general damages.
Although the record reflects that plaintiff had been involved in several prior accidents and as a result had previously made several claims which were either adjudicated or settled, there is no doubt but that in the accident of April 17, 1984, he received a substantial injury to his right knee and a cervical injury which persists to date. A review of the testimony of Doctor Beurlot in connection with plaintiff's knee injury substantiates the gravity of that injury. With regard to plaintiff's neck injury, the medical evidence indicates that plaintiff had legitimate joint problems of the neck which caused him pain. Doctor Lowrey, who evaluated plaintiff both in connection with his knee and neck problems, generally agreed with both Doctors Beurlot and Vogel but indicated that plaintiff's impairments could not be traced solely to the accident in question inasmuch as plaintiff had had numerous accidents in the past. Doctor Lowrey's suggestion is somewhat speculative, however, in any event a defendant takes the victim as he finds him and is responsible for any aggravation of a pre-existing injury. In reviewing this record and being mindful of the standard of appellate review of awards for damages as set out in Coco, supra, and its progeny, we find that, considering all circumstances, the award for general damages is impermissably low constituting an abuse of discretion. We conclude that $15,000.00 is the lowest amount which the trier of fact could have awarded as reasonably within its discretion.
The defendant, in its answer to this appeal, urges that the jury abused its discretion in awarding $18,500.00 in past and future medical expenses. Defendant maintains that the award should be reduced to $6,910.52, the amount of the past medical expenses because plaintiff has failed to prove any future medical expense.
Plaintiff testified that he has continued therapy and not undergone the neurotomy proposed by Doctor Vogel because he doesn't have the money to pay the hospital bills. According to Doctor Vogel, plaintiff could likely experience an eighty to ninety percent recovery if this surgery is performed. Doctor Vogel testified that his fee for the surgery would be "... about two thousand, twenty-five hundreddepending on what we find when he's in the hospital if he has any difficulties at all ..." In addition, Doctor Vogel indicated that the plaintiff would need to be in the hospital about three days at an approximate cost of $1,000.00 per day, or $3,000.00.
From the above, we cannot say that because plaintiff has not had the surgery to date that he will not undergo the neurotomy. We find, however, that the only medical expenses proven in this case were $6,910.52 for past medical expenses and $5,500.00 for future medical expenses.
*213 Hence, we find that the judge erred in awarding the sum of $18,500.00 for medical expenses and that award will therefore be reduced to the sum of $12,410.52.
The final issue concerns the district court's refusal to award plaintiff penalties and attorney's fees under La. R.S. 22:658 for State Farm's alleged arbitrary and capricious failure to pay under its uninsured motorist provision of plaintiff's policy.
In McGrew v. State Farm Mutual Automobile Insurance Company, 385 So.2d 1276 (La.App. 3rd Cir.1980), this Court found that the trial judge did not abuse his discretion in failing to award penalties and attorney's fees. A portion of the trial judge's reasons disallowing the penalties and attorney's fees were cited in the opinion as follows:
"`Where, as here, there is a serious question of quantum and two other parties as primary insurers, it is not unreasonable for the UM carrier to withhold payment.'"
As in McGrew, supra, this case involved two liability insurers whose coverage was primary and a UM carrier who was an excess insurer. In addition, the district judge stated that State Farm was not arbitrary and capricious in failing to pay in that there was a legitimate basis for a dispute. Having reviewed all of the evidence, we do not think that the trial judge abused his discretion in refusing to award penalties and attorney's fees. See McGrew, supra; Manuel v. American Indemnity Company, 368 So.2d 1200 (La. App. 3rd Cir.1979).
Accordingly, the portion of the district court judgment which awarded plaintiff the sum of $18,500.00 for medical expenses is amended so as to reduce that amount to the sum of $12,410.52. The portion of the district court judgment which awarded plaintiff the sum of $10,000.00 in general damages is amended so as to increase that amount to the sum of $15,000.00. The judgment is otherwise affirmed. Costs of this appeal to be assessed equally to plaintiff and defendants.
AFFIRMED, AS AMENDED.
NOTES
[1] Jartran and Travelers were released from the lawsuit when Travelers tendered the policy limits of $10,000.00 to plaintiff. Jones and Dairyland were likewise released when Dairyland paid to plaintiff the amount of liability coverage under its policy with Jones, which amounted to $5,000.00. State Farm paid to plaintiff $5,000.00 under a provision covering plaintiff up to that amount for medical bills sustained as a result of this accident.