747 So.2d 656 (1999)
Bobby DUNCAN, et al., Plaintiffs Appellants/Appellees,
v.
KANSAS CITY SOUTHERN RAILWAY CO., et al., DefendantsAppellants.
No. 99-232.
Court of Appeal of Louisiana, Third Circuit.
November 3, 1999.
Rehearing Denied December 8, 1999.
*658 James J. Cox, Michael K. Cox, Lake Charles, for Bobby Duncan, Indiv. etc., et al.
Richard E. Gerard, Jr., Lake Charles, for Kansas City Southern Ry. Co., et al.
Lawrence Alan Mann, Donald Edward McKay, Jr., New Orleans, for Midwest Mutual Ins. Co.
James Buckner Doyle, Lake Charles, for Preferred Risk & Bible Baptist.
H.O. Lestage, III, De Ridder, for State Farm Ins. & Lloyd Mitchell.
Ronald J. Fiorenza, Alexandria, for Beauregard Parish Police Jury & Titan Indemnity.
LaVon Denise Raymond, Baton Rouge, for State of La., Dept. of Health & Hosp.
Byrlyne Van Dyke, for Lloyd Mitchell, Estate of.
Before DECUIR, AMY and PICKETT, Judges.
AMY, Judge.
A train and a church van collided resulting in the death of one passenger in the van and injury to the remaining two passengers. The parents of the three passengers, sisters, brought suit against the train company, the parish, the church and its insurers, as well as the driver and his insurer. Following a bifurcated trial in which a verdict was returned in favor of the plaintiffs, fault was apportioned between the railroad and the driver. The railroad and the church's insurer have appealed.

Factual and Procedural Background
The accident at issue occurred on September 11, 1994 at the intersection of a *659 Kansas City Southern Railway Company (KCS) track and East Iowa Road in Beauregard Parish, Louisiana. According to the record, Lloyd Mitchell was driving a van owned by the Bible Baptist Church (Church) and was returning children to their homes following Sunday services. His only remaining passengers at the time of the accident were the three daughters of Bobby and Nelda Duncan, Amanda, Rachel, and Myranda. As Mitchell proceeded in an easterly direction on East Iowa Road, the van was struck by a northbound KCS train when he attempted to cross the tracks. Amanda Duncan, who was twelve years old at the time, was killed from the impact of the train. Eleven-year old Rachel was rendered a quadriplegic, while Myranda, age seven, suffered less serious physical injuries.
The original petition instituting this matter was filed by Bobby Duncan, individually and on behalf of Rachel and Myranda, and Nelda Duncan, individually. Named as defendants in this petition, and in subsequent amendments, were KCS, the train's crew,[1] Beauregard Parish Police Jury and its insurer, Titan Indemnity Company, Mitchell and his insurer, State Farm Automobile Insurance Company, as well as the Church and its insurers, Preferred Risk Mutual Automobile Insurance Company and Midwest Mutual Insurance Company.[2] Cross-claims between the defendants followed.
The plaintiffs alleged that KCS was negligent in failing to adequately clear its right-of-way adjacent to the railroad tracks which caused inadequate sight line distances and in installing insufficient signage at the intersection. As for Mitchell, the plaintiffs asserted that he was negligent in failing to stop at the stop sign or yield to the oncoming train. The plaintiffs also alleged that East Iowa Road was owned by Defendant Beauregard Parish and that the Parish was responsible for the accident in that its right-of-way was not adequately cleared and proper signage was not installed, namely, stop ahead and railroad crossing ahead signs.
The matter proceeded to trial in July 1998. A jury determined the fault, or lack thereof, of KCS and Mitchell. Furthermore, the jury was charged with the awarding of damages and the allocation of fault between KCS, Mitchell, and the Parish. However, the liability of the Parish was decided by the trial court. The jury determined that all three defendants were negligent and that their negligence was a legal cause of the accident. KCS was apportioned 58.6% of the fault, while 15% was attributed to the Parish and 26.4% was assigned to Mitchell. The trial court, however, determined that, although the Parish breached its duty in failing to install required signs, this breach of duty was not a cause-in-fact of the accident as Mitchell was aware that he was approaching a railroad track. Thus, the trial court reconciled its verdict with that of the jury and reapportioned fault in the amounts of 68.94% to KCS and 31.06% to Mitchell.
With regard to damages, the jury's verdict was broken down as follows:

Bobby Duncan
 Mental anguish and suffering due to the death of Amanda: $ 350,000.00
 Loss of consortium with Amanda: $ 125,000.00
 Funeral expenses of Amanda: $ 3,691.31
 Loss of consortium caused by injuries to Rachel: $ 100,000.00
 Loss of consortium caused by injuries to Myranda: $ 0.00

*660
Nelda Duncan
 Mental anguish and suffering due to the death of Amanda: $ 350,000.00
 Loss of consortium with Amanda: $ 125,000.00
 Loss of consortium caused by injuries to Rachel: $ 250,000.00
 Loss of consortium caused by injuries to Myranda: $ 0.00
 Negligent infliction of emotional distress: $ 100,000.00
Rachel Duncan
 Past medical expenses: $ 597,475.00
 Future medical expenses: $17,000,000.00
 Loss of future earning capacity: $ 502,230.00
 Physical pain and suffering: $ 4,000,000.00
 Mental anguish: $ 1,500,000.00
 Loss of enjoyment of life: $ 2,500,000.00
Myranda Duncan
 Medical expenses: $ 8,417.00
 Physical pain and suffering: $ 15,000.00
 Mental anguish: $ 250,000.00
 Negligent infliction of emotional distress: $ 100,000.00

Thus, the judgment entered in favor of the plaintiffs totals $27,876,813.31.
On appeal, KCS alleges the following assignments of error:
I. The jury was manifestly erroneous and clearly wrong in deciding the legal duty of Kansas City Southern Railway Company and any violation of that duty. It failed to properly apply the law to the undisputed facts of this case and its verdict is, therefore, contrary to law.
II. The district court committed reversible error in allowing plaintiffs' expert highway design engineer to testify regarding inadequate signage and sight distances at the crossing.
III. The jury abused its discretion in allocation of fault.
IV. The jury abused its discretion in assessment of damages.
Furthermore, Midwest Mutual appeals advancing the following issue for review:
Whether the Trial Court erred in failing to enforce the "two or more coverage forms" conditions of the policies, thereby limiting Midwest's exposure to $150,000.00.
Although the plaintiffs, too, have filed an appeal, no argument was made in this regard. Instead, the plaintiffs argued in opposition to the other two appeals and, instead of assigning error, made the following statement in their brief:
[O]ut of an abundance of caution, appellees, Bobby Duncan, et al, have devolutively appealed the judgment of the trial court dismissing the Beauregard Parish Police Jury and its insurer to preserve their right to enforce any judgment against those parties which conceivably could arise if this Court, on its own initiative, were to allocate fault to the police juror and its insurer. Appellees, Bobby Duncan, et al, appeal that part of the judgment purely as a precautionary measure and will not address herein the issue of fault on the part of the Beauregard Parish Police Jury and its insurer.
As this issue has not been addressed by the plaintiffs, it is deemed abandoned and is not addressed by this court. See Uniform Rules, Courts of Appeal, Rule 2-12.4.

Discussion

Negligence of KCS
In its first assignment of error, KCS contends the jury erred in finding *661 any legal duty on the part of the railroad in this accident. KCS argues that by the time of trial, only two of the plaintiffs' theories of recovery remained, i.e., inadequate signage and inadequate sight distances due to groundcover in the KCS right-of-way. According to its argument in brief to this court, the evidence presented at trial was insufficient to support either theory. In particular, KCS argues that the evidence unquestionably established that if Mitchell stopped at the stop sign adjacent to the railway tracks, which he was statutorily obligated to do, he could have seen six hundred feet to the south and would have been able to see the approaching train. Thus, according to KCS, the driver's ability to see an approaching train prevents a finding that the conditions at the East Iowa Road crossing constitute a "dangerous trap" and, in turn, a finding that the railroad can be held responsible in the face of Mitchell's alleged one hundred percent liability.
At the outset of our discussion, we will address the physical characteristics of the East Iowa Road crossing as described in the record. Louisiana Highway 27 runs north and south in a rural area of Beauregard Parish. East Iowa Road runs east and west intersecting Highway 27. Like Highway 27, the KCS tracks run north and south and intersect East Iowa Road. However, approximately six hundred feet to the south of the crossing, the tracks curve slightly. Eastbound travelers on East Iowa Road, like Mitchell, must cross a cattle guard and then proceed to a stop sign located approximately eighteen feet from the nearest rail of the track. After crossing the track, a motorist must then stop at another stop sign prior to entering Highway 27. In the instant matter, Mitchell was eastbound on East Iowa Road, had traversed the cattle guard, and then proceeded onto the tracks.
Turning to KCS' first assignment of error, we note that, contrary to the argument in its brief, the jury did not find that Mitchell satisfied the duties required of him as a driver. Mitchell's part in causing the accident, at least in some degree, is a relatively uncontested issue. His deposition left unresolved the issue of whether he stopped at the stop sign prior to crossing the track. A witness to the accident testified that he did not do so.[3] *662 In any event, the jury determined that Mitchell was negligent and that his conduct was a legal cause of the accident. Negligence by one party does not, of course, prevent a finding that any other actor, including KCS, could have also been negligent and contributed to the accident. La.Civ.Code art. 2323 requires that fault be apportioned to the actors who have caused or contributed to an accident.[4]
Statutorily, La.R.S. 32:169 requires the railroad to provide signage at a crossing as follows:
A. Any person, firm, or corporation controlling any railroad track which intersects a public road or street at grade crossings, except those contained in the maintenance system of the office of highways, shall erect and maintain a "Railroad Cross Buck" sign at the crossings above referred to which shall be white with the "Railroad Crossing" in black letters. The sign shall be reflectorized. If there are two or more tracks, same shall be indicated on an auxiliary sign of inverted "T" shape mounted below the cross buck. This sign shall be erected on the right hand side of the roadway of such approach to the crossing not more than fifty feet nor less than fifteen feet from the nearest rail and not less than six feet or more than twelve feet from the edge of the roadway. The sign shall be ten feet above the level of the highway and said sign shall be constructed in accordance with the standards of the office of highways.
B. The person, firm, or corporation controlling any railroad track hereinabove referred to may with written approval of the office of highways, erect stop signs at any grade crossings of railroads on highways not contained in the state maintenance system. Said signs shall be octagonal in shape, shall have a red background, and carry the word "stop" in white letters all in accordance with the standards of the office of highways. Said signs shall be located not less than fifteen feet nor more than fifty feet from the nearest rail and shall be erected on the right hand side of the highway of each approach to the crossing and not less than six feet nor more than twelve feet from the edge of the roadway. Where "stop" signs are erected the said railroad shall also erect and maintain a railroad advance warning sign on the right side of the road not less than one hundred feet nor more than three hundred feet from the nearest rail of said crossing measured along the highway, said sign shall be a yellow disk thirty-six inches in diameter carrying a ninety degree cross buck x and the letters R.R. in black in accordance with the standards of the office of highways. When such signs are erected, the driver of any vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad and shall proceed only upon the exercising of due care and being sure that it is safe to proceed.
Evidence at trial revealed the presence of both a cross buck and a stop sign. The record indicates that the stop sign was located approximately eighteen feet from the nearest rail of the track. With regard to the advance warning signs described in La.R.S. 32:169(B), the parties stipulated at *663 trial that the installation of stop ahead and advanced railroad crossing signs was the responsibility of the Parish. Although the trial court found the Parish had breached its duty in failing to install these advanced warning signs at the East Iowa Road Crossing, the court went on to find this breach was not a legal cause of the accident as Mitchell was aware of the presence of the track and the stop sign.
However, even if KCS did not violate the above-quoted statute, the railroad's potential liability does not end with that inquiry. The plaintiff's petition alleged that KCS' purported negligence extended beyond the statutory signage duty addressed above. In particular, the plaintiffs alleged generally that KCS was at fault due to a variety of actions or inactions, including failing to properly maintain the right-of-way, maintain adequate sight distances, and post sufficient "warning signs, marks and signals commensurate with the danger of the crossing[.]" Thus, even if KCS fulfilled the variety of statutory duties specifically described by law, a finding of negligence is still possible.[5]
Article 2315 of the Louisiana Civil Code provides the basis for a cause of action in negligence by providing that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." As explained by the supreme court in LeJeune v. Union Pacific R.R., 97-1843 (La.4/14/98); 712 So.2d 491, a duty-risk analysis is used to determine whether liability exists given the particular circumstances of a case. The Court explained the elements of the analysis as follows:
[A] plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Syrie v. Schilhab, 96-1027, p. 4-5 (La.5/20/97), 693 So.2d 1173, 1176-77; Berry v. State, 93-2748, p. 4 (La.5/23/94), 637 So.2d 412, 414; Mundy v. Department of Health & Human Resources, 620 So.2d 811, 813 (La.1993). Under the duty-risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. Mathieu v. Imperial Toy Corp., 94-0952, p. 4 (La.11/30/94), 646 So.2d 318, 322.
Id. at p. 5-6; 494.
Furthermore, in Kent v. Gulf States Util. Co., 418 So.2d 493, 497 (La.1982), the supreme court observed as follows with regard to the existence of a duty:
In a typical negligence case against the owner of a thing (such as a tree) which is actively involved in the causation of injury, the claimant must prove that something about the thing created an unreasonable risk of injury that resulted in the damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk, and no responsibility is placed on the owner who acted reasonably *664 but nevertheless failed to discover that the thing presented an unreasonable risk of harm.
Our review of the evidence presented by the plaintiffs supports a view that KCS knew of risks created by the unique circumstances at the crossing and that adequate steps were not taken to render the condition safe for motorists.
Dr. Kenneth Wayne Heathington testified for the plaintiffs and was accepted as an expert in the following fields: traffic engineering; highway design, operation, and safety; railroad highway grade crossing design, operation, and safety; accident reconstruction; and human factors. Although he testified that stop signs are effective traffic control devices at some crossings, he concluded that the East Iowa Road crossing presented a "unique and local safety hazard[.]" Dr. Heathington stated that "the conditions regarding sight distances, vertical curves, horizontal curves, all the other things ... that create[ ] such a safety hazard that safety precautions must be taken to permit safe passage of trains and motor vehicles at that crossing." He opined that the best alternative for safety concerns was to close the crossing, however, he stated that this would not be reasonable due to the number of people who use the crossing daily.
Dr. Heathington testified that he believed the Code of Federal Regulations required the crossing to have gates with flashing light signals rather than a stop sign. Furthermore, he stated that guidelines from the Federal Highway Administration would require the installation of gates. This opinion was based on the high traffic volume at the crossing. Dr. Heathington also stated that the sight distances associated with the crossing were inadequate. He testified that a motorist stopped at the sign had a fifty-percent deficiency in sight distances to the south due to the trees and vegetation in the area.
Remarking on his perception that the crossing presented a unique danger, Dr. Heathington testified:
Whenever you have other roads intersecting a roadway on an approach to a crossing, that is a potential for problems because of people entering or leaving or you having to enter and leave. The biggest problem here is the intersection with Highway 27, which is just a few feet across the track, roughly about 70 feet across the track. People have to merge with some fairly high speeds, relatively speaking, to East Iowa Road and volumes somewhat more, obviously, than East Iowa Road. And you have two stop signs, one right behind the other. You're trying to look to see what you're supposed to do, and that can present a problem both from visual clutter, both from the conspicuity or the attention-gettingness of that intersection for a person approaching that crossing. And they may be looking to say, you know, I'm going to turn left or right or whatever I'm going to do at that intersection, and miss some of the traffic control devices at the crossing itself. Now, nobody is saying that you can alleviate that intersection; but when those things are there, then other things have to be done to compensate for those deficiencies, in other words to compensate for it.
He further stated:
[Y]ou see Highway 27, which is parallel to the track, very close. It's about 70 feet, roughly, away from the nearest rail. And so that's what you're looking at. And you can have that crossing get lost in all of that's going on, and that intersection can be the more commanding attention of a motor vehicle operator. We don't want that to occur, but we recognize that it can occur; and we need to take that into consideration when you're evaluating something.
In addition to this expert testimony regarding sight distances and signage, the plaintiffs also presented the testimonies of Mabel Yvonne Lorenz and Miriam Massey, local school bus drivers. Lorenz testified that, during her employment in the years *665 between 1973 and 1988, she crossed the tracks on East Iowa Road at least four times per day. She stated that during this time, she complained to KCS employees on at least three occasions regarding the growth of bushes in the area. She did so because "[y]ou couldn't see to the south the train coming, and it was dangerous." Further, Lorenz testified that on the day after the accident at issue, she returned to the crossing and found the bushes in the same condition as when she complained to KCS employees.
Massey testified that she was a bus driver from 1980 until 1993 and, like Lorenz, she crossed the tracks on East Iowa Road approximately four times per day. She stated that the bushes in the southwest corner of the crossing were "bad" and "grew out in the line of vision to the track." Although she never complained to KCS, her testimony indicates that she felt the condition was such that she complained of the condition to her supervisor, parish road crews, and her "police juryman." When asked if the state of the vegetation created a dangerous condition, she responded that "[i]t definitely did." Answering the plaintiffs' counsel's question as to why she felt it created a dangerous condition, she stated: "Well, because you couldn't see down the track. And I have pulled my bus up there and a train [would] be coming and I'd be too close. And I would back up to stay in the safety zone with the kids."
Further, the jury heard from Trisha Nix, a witness to the Duncan accident. Although a portion of her testimony related to the accident at issue, she also testified regarding an accident she and her brother had been involved in thirteen months earlier at the East Iowa Road crossing. As for her own accident, she testified that she and her brother were in his truck, he was driving at approximately the same speed as her approximation for Mitchell's vehicle (5-10 mile per hour), and he "coasted across" the tracks rather than stopping. Nix testified she believed her brother had not seen the train and that she looked over, saw the train, and they were hit. Dennis Grace, a claims agent for KCS, testified that he had investigated the Nix accident.
Given the above-described testimony, as well as other evidence entered into the record, we find no manifest error in the jury's determination that KCS was negligent and a legal cause of the accident. The record indicates that KCS had a right-of-way which extended approximately 150 feet to the west of the track. Despite this right-of-way, the area was filled with brush and small trees which prohibited a view of an oncoming train beyond the curve in the tracks which was only six hundred feet from the intersection. In addition to the technical sight line deficiencies described by Dr. Heathington, Lorenz and Massey testified that the condition troubled them as bus drivers. Lorenz even went so far as to report the condition to KCS.
Furthermore, our review supports the view that, in addition to the groundcover, a special situation was created at the crossing. An eastbound driver had to slow his or her vehicle and possibly even stop at some point while proceeding across the cattle guard due to roughness. The slow speed required for this maneuver can be seen as possibly creating a false sense by making a driver feel that no further stops are necessary before crossing the tracks. Also, as explained by Dr. Heathington, the anticipation of merging onto Highway 27 could distract a driver from stopping at the sign. Both Dr. Heathington and KCS' expert confirmed that studies indicate that eighty to eighty-five percent of drivers at rural railroad crossings do not stop at the adjacent stop signs.
Finally, our review of the evidence supports a view that KCS had knowledge that an unreasonable risk of injury was created by the crossing, but that nothing was done to remedy the situation. Lorenz testified that she repeatedly informed KCS of the difficulty created by the groundcover. KCS also had prior knowledge of the danger *666 created at the intersection due to their knowledge of the Nix accident, which occurred thirteen months prior to that at issue here. Finally, the jury heard expert testimony indicating that the majority of drivers do not stop at the stop signs installed for their safety. Despite these indications that the crossing presented an unreasonable risk of harm, steps were not taken to render the crossing safe for the vast majority of drivers KCS knew would be traveling on the road, i.e., drivers who would not stop at the stop sign (up to eighty-five percent of those approaching a crossing with a stop sign) and could only see down the tracks for a limited distance.
We also address KCS' contention that the jury erred in finding that the East Iowa Road crossing constituted a "dangerous trap." As explained by the second circuit in Moore v. Kansas City S. R.R. Co., 31,080, p. 3 (La.App. 2 Cir. 10/28/98); 722 So.2d 296, 298, writ denied, 98-2943 (La.1/29/99); 736 So.2d 832, a dangerous trap is created when a motorist's view "is so obstructed as to force him into a position of peril, dangerously near the tracks, before he has a view of the oncoming train." KCS contends that the jury could not have concluded that such a condition was created because, according to the testimony presented, a driver stopped at the stop sign could see to the curve in the tracks, six hundred feet away.
Although the jury was instructed as to what constitutes a dangerous trap, there is no indication whether the jury found the existence of such a condition at the intersection. However, the absence of such a condition does not mean that the railroad cannot otherwise be negligent. As described above, testimony was presented indicating that the crossing posed a unique danger. This can be seen from the evidence indicating visual clutter, reduced sight lines, unique circumstances surrounding the crossing of the cattle guard, and knowledge that a majority of motorists do not stop at the stop signs adjacent to the tracks. Therefore, even if a motorist stopped at the sign could see a train for up to six hundred feet, we do not conclude that the evidence prohibits a jury from concluding that the conditions presented an unreasonable risk of injury described in Kent. We find this argument without merit.

Federal Preemption
In its next assignment of error, KCS contends the trial court erred in permitting the plaintiffs to present Dr. Heathington's testimony regarding the adequacy of signage and sight distances at the crossing. First raised in a pre-trial motion, KCS contends that federal funds were spent at the crossing for the installation of signs and, therefore, since the signage was determined to be adequate under federal law, testimony as to its inadequacy is prohibited.
Quoting from 45 U.S.C. § 431(a), the United States Supreme Court in CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 661, 113 S.Ct. 1732, 1736, 123 L.Ed.2d 387 (1993), stated that the Federal Railroad Safety Act of 1970 was enacted to "`to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons....'" Under this provision, the Secretary of Transportation was given authority to promulgate rules and regulations related to railroad safety. As explained by the Court, the statute also contained a pre-emption clause providing that laws relating to railroad safety be nationally uniform. However, states were permitted to also enact safety requirements as long as they were compatible with federal law and did not place an undue burden on interstate commerce.
Following the allocation of federal funds for states' cooperation in determining which railroad crossings required improved signage and implementing related projects, several regulations were enacted addressing standards required by the federal government. 23 C.F.R. § 646.214 is *667 one such regulation. KCS contends that this regulation, specifically 23 C.F.R. § 646.214(b)(3) and (4), preempts state law, in this case, the installation of warning devices. 23 C.F.R. § 646.214(b) provides, in part, as follows:
(b) Grade crossing improvements.
. . . .
(2) Pursuant to 23 U.S.C. 109(e), where a railroad-highway grade crossing is located within the limits of or near the terminus of a Federal-aid highway project for construction of a new highway or improvement of the existing roadway, the crossing shall not be opened for unrestricted use by traffic or the project accepted by FHWA until adequate warning devices for the crossing are installed and functioning properly.
(3) (i) "Adequate warning devices", under Sec. 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:
(A) Multiple main line railroad tracks.
(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.
(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
(F) A diagnostic team recommends them.
(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.
(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.
In Easterwood, 507 U.S. at 671, 113 S.Ct. at 1741, a case in which a state negligence claim was also at issue, the Court explained that:
In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.
A pretrial hearing was held regarding KCS' federal pre-emption claim at which both KCS and the plaintiffs presented exhibits. Following a review of the exhibits, some of which are letters referencing federal funds allocated for sign replacement in the area, the trial court determined that KCS failed to prove the expenditure of federal funds at the crossing. Referencing the evidence presented, the trial court stated as follows:
So I'm going to disregard what that means, since nobody else seems to know what it means, either. But it shows "changed signs as needed and placed inventory numbers as follows." It does not say that they changed the sign at this particular crossing. It does say they placed inventory numbers on it.
... The Court is going to rule that the burden of proof has not been carried through the introduction of these exhibits to prove that actual federal funds *668 were expended on work at the particular crossing known as East Iowa crossing, despite there [sic] is some indication, certainlyThere is strong indication that it may have been done and that there is strong indication that there was a good bit of work done in Beauregard Parish. But I do not find that the burden of proof has been met as to proving that this particular crossing had work performed on it involving federal funds. There's always things that you can look at further. And, of course, having a witness from the fence company may have helped. Further testimony from persons who live in the area might have helped. But be that as it may, with the presumption being against preemption and the burden being on the defendants to prove that federal funds had been expended in order to make the federal preemption applicable, the Court's ruling is that there is not sufficient proof that federal funds were expended on this particular crossing; and, therefore, federal preemption will not apply. That's the ruling of the court.
Our review of the evidence offered reveals no error in the trial court's assessment of the evidence. In sum, the evidence offered indicates that the Louisiana Department of Transportation and Development used federal funds as part of a 1980 project to install or replace advance railroad crossings signs and crossbuck signs at crossings in the state, including those in Beauregard Parish. Furthermore, evidence demonstrates that the East Iowa Road crossing was included in this project. However, the evidence does not necessarily demonstrate that signs were replaced/installed with the use of federal funds at this crossing. Additionally, the plaintiffs presented a letter from DOTD that those signs encountered during the project which were in good condition could remain. Thus, even if under consideration during the project, federal funds may not have been used to improve/replace signs at the crossing. This assignment is without merit.

Allocation of Fault
KCS alternatively asserts error in the jury's allocation of fault. KCS argues in its brief that "[t]o say that the railroad was 58.6 percent at fault while Mitchell was only 26.4 percent at fault is not a finding that reasonable men and women could arrive at."[6] Rather, according to KCS, any fault on its part was minimal in comparison to that of Mitchell and that a finding of less than fifty percent of the fault on its part would be more appropriate.
Determinations regarding apportionment of fault are factual matters and will not be disturbed on appeal unless clearly wrong or manifestly erroneous. Sandidge v. State Through Dept. of Transp. and Dev., 626 So.2d 560 (La.App. 3 Cir.1993). In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), the Louisiana Supreme Court offered guidelines for use in the apportionment of fault stating:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, *669 without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
See also Blair v. Tynes, 621 So.2d 591 (La.1993).
Considering these factors in relation to the evidence presented, we do not find the apportionment of fault to be clearly wrong. Although the record clearly supports a finding that Mitchell was at fault to some degree, we find no evidence requiring the trial court to apportion a larger percentage of the fault to him. Rather, the evidence presented leaves at least some equivocation as to whether Mitchell stopped at the cattle guard and the stop sign. While the weight of the evidence seems to support a finding that he did not stop at the stop sign adjacent to the tracks, his own deposition testimony leaves this question unresolved.
Even if the jury determined that he did not do so, we conclude that the record does not preclude a finding that KCS bore the majority of the fault. Namely, we point to evidence indicating the presence of ground cover obscuring sight beyond a curve in the tracks only six hundred feet from the crossing and that despite the presence of this unique situation, the ground cover was not removed nor were more appropriate warning signals installed. Also, experts, including one presented by KCS, testified that eighty to eighty-five percent of drivers do not stop at stop signs. Despite the availability of such information, along with knowledge of a prior accident and other complaints, steps were not taken to render the condition less hazardous. Reviewing this type of evidence in light of the factors expressed by the supreme court in Watson, we conclude the apportionment of fault was not clearly wrong.
This assignment of error lacks merit.

Damages
In its final assignment of error, KCS contends the quantum of several of the damages awarded is excessive and was based on prejudice and sympathy. In particular, KCS argues that the jury awarded excessive amounts to Rachel for general damages and medical expenses. Also, KCS contends that Mr. and Mrs. Duncan were awarded excessive general damages associated with the death of Amanda and that Myranda was awarded excessive sums for both mental anguish and negligent infliction of emotional distress.

Rachel Duncan
First, we address KCS' contention that the eight million dollars awarded to Rachel was excessive. KCS contends that this figure far exceeds other awards made for others similarly injured. As support for this argument, several cases are referenced wherein general damage awards were in the three million dollar range. KCS argues that the award should be reduced to be in line with these lower figures.
As explained by the supreme court in Reck v. Stevens, 373 So.2d 498 (La.1979), appellate courts afford discretion to a trial court's determination as to general damages. The appellate court properly reviews the trial court's exercise of discretion under the particular facts and circumstances of the case and does not reverse the award in the absence of a clear abuse of discretion. Id.
Commenting upon its prior decision in Reck, the supreme court in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993) specifically disapproved of the initial comparison of the awards under review with those from previous cases. The court stated:
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular *670 injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La. 1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).
Id. at 1260-61. The court further explained that "[i]t is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Id. at 1261.
Thus, before comparing the award made to Rachel with other cases involving paraplegia/quadraplegia as urged by KCS, we must first consider whether the award is excessive under the facts and circumstances unique to this case. Only if we find the award was either abusively excessive or inadequate do we consider applicable jurisprudential awards.
Our review of the record reveals no clear abuse of discretion as required for an alteration of general damages on appeal. Rather, the jury heard a description of the train impact, which not only rendered Rachel a quadraplegic, but also killed her older sister and injured her younger sister. Testimony indicated Rachel will need twenty-four hour care for the remainder of her life and will require extensive medical treatment. Medical testimony was also presented regarding problems she has had with respiratory failure, pneumonia, scoliosis, a dislocated hip, headaches related to elevated blood pressure, urinary tract infections, and life-threatening decubitus ulcers which have required surgery. Additionally, Dr. Kathryn A. Zidek, the Director of the Pediatric Rehabilitation Program at The Institute of Rehabilitation and Research in Houston, evaluated Rachel and stated that she believes Rachel will never be free from the tracheotomy tube now in place, a tube which must be suctioned repeatedly throughout the day and night. Dr. Zidek also testified that she believes Rachel suffers from depression which would best be treated with anti-depressants and ongoing treatment. Further, Dr. Zidek opined that, due to this depression, Rachel's nutritional state has declined to the point where supplemental feedings are required and will best be delivered through a feeding tube. This opinion was shared by Dr. Frank William Lorenz, Rachel's treating physician at the time of trial.
In addition to the staggering physical, mental, and emotional obstacles associated with Rachel's condition, the jury was also aware that Rachel's school, social, and home life were drastically altered. Given the extreme circumstances presented in this case, circumstances which include not only her own injury, but the death of her sister, we do not find that the jury's award for general damages was a clear abuse of its much discretion in this area.
Next, we turn to the award made to Rachel for future medical expenses. KCS argues that the seventeen million dollar sum awarded in this area is excessive. Although the medical care plans offered by *671 the plaintiffs and KCS included many similar elements, they differed chiefly in the type of attendant care recommended. The plaintiffs' experts recommended twenty-four hour skilled nursing care, while KCS argues that, after Rachel recovered to a certain extent, she could be adequately cared for by trained aids from the community. Further, the parties' economists differed in the methodology used to calculate the expenses.
In order to recover future medical expenses, a plaintiff must demonstrate that, more probably than not, the expenses sought will be incurred. Myers v. Broussard, 96-1634 (La.App. 3 Cir. 5/21/97); 696 So.2d 88. Medical testimony regarding the necessity of the treatment and its probable cost must be presented. Id.
The plaintiffs presented Dr. Robert D. Voogt and Dr. Lopez to testify regarding Rachel's future needs. They both recommended skilled nursing care, rather than the unskilled attendant care recommended by KCS' expert, because of the type of care Rachel needed. They explained that skilled nursing care would better serve Rachel because of the need for invasive procedures, e.g., catheterization and suctioning of the tracheotomy. They also explained that nurses are more likely to detect problems early on before complications arise. Dr. Voogt further opined that the family should have the ability to hire nursing help from an agency rather than hire them individually. This ability permits more consistent care, but is more expensive than hiring nurses individually.
Applying Dr. Voogt's plan for future medical needs, Dr. Bernard Pettingill, Jr. was accepted as an expert in economics, and testified as to the cost of the care plan. He stated that based on her life expectancy, Rachel's future medical costs discounted to present value equal $16,635,380. However, this figure does not include a particular bed subsequently recommended by Dr. Lopez. According to Dr. Pettingill, this bed alone, over the course of Rachel's life, would add an additional $1,400,000.00 to the expenses.
Thus, the jury was presented with conflicting expert testimony presented by each of the parties. Although they contained substantially similar elements, the parties' experts differed as to the type of attendant care required and the type of methodology used to calculate the final figure. As explained by the supreme court, "[w]here the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible." Syrie v. Schilhab, 96-1027, p. 4 (La.5/20/97); 693 So.2d 1173, 1177. Upon review of this determination, the reviewing court does not decide whether the trier of fact made the correct decision, but whether the trier of fact's conclusion was reasonable. Id. Based upon our review of the expert testimony presented, we find that the jury's reliance upon the testimony of the plaintiffs' experts was reasonable. Accordingly, we affirm the award for future medical expenses.

Bobby and Nelda Duncan
KCS also argues that the award for general damages to Mr. and Mrs. Duncan due to Amanda's death is excessive. Each parent was awarded $475,000.00 in this area ($350,000.00 for mental anguish and $125,000.00 for loss of consortium). KCS references other awards and states that awards for the loss of a child typically range between $125,000.00 and $250,000.00. In its brief, KCS contends that "[a]wards higher than $150,000.00, however, are infrequent and invariably involve evidence of unusually extreme grief resulting in psychological derangement."
Once again we are mindful of the instruction from the supreme court in Youn, 623 So.2d 1257, as stated above, that an initial comparison of the matter under review with other cases is incorrect. Rather, we turn to whether the award is justified under the circumstances presented in this case. Doing so, we observe that not only *672 did Mr. and Mrs. Duncan lose their oldest daughter, but went to the crossing immediately after the accident and although Rachel had been taken to the hospital, Amanda was still lying at the scene. Further, Dr. Charles Monlezun, an expert in clinical social work and public health, stated that he visited with the family on a number of occasions, both in their home and at his office. He testified regarding Mr. and Mrs. Duncan's difficulty with the grieving process and described how this process is complicated by the life-changing injuries sustained by Rachel. He stated that the family lives with the accident every day due to the attention required for Rachel's care. Therefore, we are mindful that the jury did not hear that Mr. and Mrs. Duncan sustained the loss of Amanda in a vacuum. Rather, at the same time they were confronted with this loss, they also were required to cope with the injuries suffered by their other two daughters. Given these circumstances, we find no abuse of discretion in the jury's award of general damages to Mr. and Mrs. Duncan and do not turn to a comparison of this case with others previously reported.

Myranda Duncan
Finally, KCS contests the awards made to Myranda for mental anguish associated with the accident, $250,000.00, and negligent infliction of emotional distress, $100,000.00. KCS briefly argues that both awards are excessive.
As for the mental anguish award, KCS contends that an award of $10,000.00 to $25,000.00 is the standard award given to a child to compensate for the emotional trauma of being in an automobile accident. Our review of the circumstances presented here reveals no abuse of discretion in the jury's award of $250,000.00. While true that Myranda received much less serious injuries from the accident than Rachel, the testimony reveals that she did not escape unscathed. Rather, Dr. Monlezun testified that she suffered from post-traumatic stress disorder or post-traumatic stress syndrome and that she suffered from survivor's guilt. Addressing this survivor's guilt, Dr. Monzelun stated as follows:
We see this in combat veterans. I saw it when I treated combat veterans when I was in the service: a tremendous amount of guilt associated with being the one who survives. "One deceased, one severely injured, and I walk away. What makes me so special?" And so what happens there is that guilt gets converted into: "I can't do enough." So we have a child who's prematurely gray. She's locked into this role, and I think that it would be helpful for Myranda, at key times in her lifeShe's going to be 11 nextin a couple of weeks, later this month. She's going to be 11 years old. She's becoming a young woman. As she enters menses and starts to be a woman, as she starts to date, especially when she gets old enough to think about marriage or college or leaving home, the leaving-home thing, whenever that is, that's going to be very hard for her to handle psychologically, because she's locked in. Her guilt locks her in.
He recommended that Myranda receive period counseling at these critical stages in her development.
Further, both Dr. Monlezun and Mrs. Duncan remarked on Myranda's fear in riding in the family van after the accident. Mrs. Duncan stated: "[w]hen we first got the van, she couldn't ride in the van. She was too scared. She just knew that someOr say a car c[a]me around to pass me. This girl would just almost try to jump to get to the other side of the van where I was at." Mrs. Duncan stated that, although Myranda's fears have gotten better, there are still times when she will not ride in the front seat, but will ride in the back. Given the circumstances described above, we find no abuse of discretion in the jury's award.
As with KCS' argument regarding general damages for Myranda, KCS does not contend that any award for negligent infliction of emotional distress was error, *673 but contends only that the $100,000.00 award is excessive. Our review of the evidence presented does not reveal an abuse of discretion in this figure arrived at by the jury.
Although Myranda responded "[n]ot much" when asked what she could remember from the accident, the evidence related above supports the determination that Myranda suffered emotional distress as a result of the injury. Given the circumstances and aftermath described, we find no abuse of discretion in the award.
This assignment is without merit.

Midwest Mutual Insurance Policy
We next address the separate appeal filed by Midwest Mutual. The record reveals that the Church was covered by two insurance policies. First, Preferred Risk provided primary automobile coverage in the amount of $350,000.00. Additionally, Midwest Mutual issued a $500,000.00 general liability policy. The parties stipulated that Preferred Risk and Midwest Mutual are affiliated companies. As Mitchell, a church volunteer, was found to be liable in part in causing the accident, coverage by the policies was at issue. After trial, Midwest Mutual filed a brief with the trial court wherein it urged that an "affiliated company" clause contained within the policies prevented full recovery under each policy. Rather, Midwest Mutual urged that the policy language required that recovery be limited to the highest amount allowable under either policy.
The policy language advanced in this appeal and found in the Midwest Mutual policy under the portion relating to "Business Auto Conditions" provides as follows:
7. Two Or More Endorsements, Coverage Forms Or Policies Issues To You By Us.
If two or more endorsements, Coverage Forms or policies issued to you by us or any company affiliated with us apply to the same "accident," the aggregate maximum Limit of Insurance under all the endorsements, Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one endorsement, Coverage Form or policy. This condition does not apply to any endorsement, Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this endorsement.
Similarly, the following language is found in the Preferred Risk policy:
8. TWO OR MORE COVERAGE FORMS OR POLICIES ISSUED BY US
If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "accident," the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

(Emphasis added.)
Midwest Mutual contends, as it did before the trial court, that this provision limits Midwest Mutual and Preferred Risk's mutual obligation to $500,000.00, "the highest applicable Limit of Insurance under any one Coverage Form or policy."
Also found within the policies are "other insurance" clauses. The Preferred Risk policy contains the following language:
5. OTHER INSURANCE
a. For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance.
(Emphasis added.) The Midwest Mutual policy, however, contains slightly different language and importantly replaces the "primary insurance" term above with "excess insurance":
3. Other Insurance.

*674 a. For any covered "auto," the insurance provided by this endorsement is excess over any other collectible insurance. For Medical Payments Coverage, other collectible insurance applies only to other collectible auto medical payments insurance.
b. This endorsement's Liability Coverage is primary for any liability assumed under an "insured contract."
c. When this endorsement and any other endorsement, Coverage Form or policy covers on the same basis we will pay only our share. Our share is the proportion that the Limit of Insurance of our endorsement bears to the total of the limits of all the endorsements, Coverage Forms and policies covering on the same basis.
(Emphasis added.)
Thus, the issue is whether the "other insurance" clause of the Midwest Mutual policy renders the policy "excess" in this situation. If so, "affiliated company" clause is inapplicable here and the two companies may be obligated up to the face value of each policy. The trial court concluded that the Midwest Mutual policy served as an excess policy and, therefore, is excluded from the limitations of the "affiliated company" clauses. In reasons for judgment, the trial court explained as follows:
It is clear that the primary coverage in this case is provided by Preferred Risk Insurance Company and the excess coverage is provided by Midwest Mutual Insurance Company. Coverage by Midwest Mutual Insurance Company was previously determined by Summary Judgment dated December 16, 1997 with the court finding there to be coverage under its CGL policy. That Summary Judgment is presently on appeal.
Midwest Mutual Insurance Company contends that since both the Midwest Mutual Insurance Company and Preferred Risk Insurance Company policies have "affiliated company" clauses which limit any claims against either company which arise from the same accident to the higher limits of the two policies and that therefore the applicable coverage in this case would be $500,000.00. This would mean that the Midwest Mutual Insurance Company policy would provide on $150,000.00 additional coverage to that of Preferred Risk Insurance Company's policy limits of $350,000.00.
. . . .
Following the argument of Midwest Mutual Insurance Company, it would seem that had the Midwest policy been issued with a face amount of $350,000.00 rather than $500,000.00, there in fact would be no additional coverage resulting from the issuance of the Midwest Mutual Insurance Company policy. I do not believe that would be the intent of either of the parties.
It is well settled that since insurance policies are generally contracts of adhesion any ambiguity should be interpreted in favor of the insured. In this case, the policy language, "This condition does not apply to any endorsement, coverage form or policy issued by us or an affiliated company specifically to apply as excess insurance over this endorsement.", appears to this court to be ambiguous. It does not differentiate between an "actual primary policy" with an "excess" other insurance clause and a "true excess" insurance policy. Midwest Mutual Insurance Company would like the court to draw such a distinction citing Penton v. Hotho, 601 So.2d 76[762] (La.App. 1st Cir[.]1992). If such a distinction should be drawn, it should be drawn within the policy itself and not stated in such an ambiguous manner as it appears in the Midwest Mutual Insurance Company policy.
This court, therefore, concludes that the Midwest Mutual Insurance Company policy provides for coverage for $500,000.00 which is [in] addition to or in excess of the $350,000.00 coverage provided by Preferred Risk Insurance Company.
*675 In its appeal, Midwest Mutual argues that the Midwest Mutual policy is not a true excess policy as it is lacking in excess policy characteristics, e.g., it does not specify what type of underlying policy is required, whether any primary insurance is required, and it does not list primary policies. Rather, Midwest Mutual asserts that its policy is primary and that it "only contains an `other insurance' provision to make it secondarily liable if another unexhausted policy is available." It contends that, contrary to the trial court's findings, the "excess" language found in the "other insurance" clause of the policy cannot transform it into a true excess policy. In support of its position, Midwest Mutual directs this court's attention to Federal Ins. Co. v. St. Paul Fire and Marine Ins. Co., 93-1099 (La.App. 1 Cir. 6/24/94); 638 So.2d 1132 and Penton v. Hotho, 601 So.2d 762 (La.App. 1 Cir.1992) wherein the first circuit discussed "other insurance" clauses and whether these clauses can transform a policy into an excess policy.
Our review of the cases advanced by Midwest Mutual does not reveal error in the trial court's reasoning. Rather, the two cases cited above, Federal Ins. Co., 93-1099; 638 So.2d 1132 and Penton, 601 So.2d 762, deal strictly with "other insurance clauses." While true that these cases deal with the first circuit's determination that an "other insurance" clause cannot transform a primary policy into an excess policy, we do not have such a clearly delineated problem in this case. Rather, we are confronted with two policies issued by the same company, one of which specifically states that it acts as an excess policy over any other collectible insurance. The other collectible insurance in this case was issued by an affiliated company and states that it provides primary coverage. Given this type of inter-relationship between the parties, we find no error in the trial court's determination that the "affiliated companies" clause, and the provision that it does not apply in the face of a policy issued as an excess policy, is ambiguous as it does not clearly indicate whether it applied to the situation created by its own policies.
As explained by the supreme court in Crabtree v. State Farm Ins., 93-0509, p. 6 (La.2/28/94); 632 So.2d 736, 741, an insurance "policy should be construed as a whole and one portion thereof should not be construed separately at the expense of disregarding another." If, however, ambiguity remains, the contractual provision should be construed against the insurer and in favor of the insured party. Id. Applying this precept, we find no error in the trial court's determination.
This assignment lacks merit.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed in all respects. All costs of this appeal are to be divided equally between appellants, Kansas City Southern Railway Company and Midwest Mutual Insurance Company.
AFFIRMED.
NOTES
[1] Although the KCS crewmembers were named as defendants, a partial summary judgment was entered in February 1998 dismissing the crew following a finding of no operational negligence by KCS or its crew.
[2] The State of Louisiana, through the Department of Transportation and Development, was also named as a defendant, but was subsequently dismissed by summary judgement.
[3] At the time of the accident, La.R.S. 32:171 required that a vehicle approaching a railroad crossing stop his vehicle in the following instances:

A. Whenever any person driving a motor vehicle approaches a railroad grade crossing under any of the circumstances stated in this Section, the driver of such vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
(1) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train.
(2) A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train.
(3) A railroad train approaching within approximately nine hundred feet of the highway crossing emits a signal in accordance with R.S. 32:168, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard.
(4) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.
In 1998, the legislature amended La.R.S. 32:171 and added Section (A)(5) which provides that a driver must stop as described above when: "A stop sign is erected at the approach to a railroad grade crossing."
Additionally, La.R.S. 32:175(A) requires that a driver yield as follows:
The driver or operator of a vehicle approaching a rail-highway grade crossing identified by the presence of a railroad cross buck sign shall slow down to a speed reasonable for the existing conditions, or shall stop if necessary, before entering the cross walk on the near side of the intersection or, in the event there is no cross walk, at a clearly marked stop line, or if none, then at the point nearest the intersecting rail of such railroad where the driver or operator has a clear view of any approaching train. The driver or operator shall listen and look in both directions along such track for any approaching train and for signals indicating the approach of a train. Having slowed or stopped in this manner, the driver or operator shall yield the right of way to any approaching train and then shall proceed only upon exercising due care and upon being sure that it is safe to proceed.
[4] At the time of the 1994 accident at issue here, La.Civ.Code art. 2323 provided as follows:

When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
[5] Neither do we find LeJeune v. Union Pacific R.R., 97-1843 (La.4/14/98); 712 So.2d 491 dispositive of this case as suggested by KCS. In LeJeune, the supreme court reasoned that the jury could have found the driver of the automobile involved solely responsible for the automobile/train collision at issue. While the court discussed the statutory duties attendant to the parties' positions and concluded that the evidence supported a finding that the train crew had fulfilled those duties, the case does not, in our opinion, stand for the proposition that fulfillment of statutory duties prevents a finding of other negligent conduct. Rather, the supreme court reasoned that under the evidence presented in that case, the jury's finding that the defendant railroad was not negligent was reasonable. Similarly, we conclude the evidence presented in this case supports the jury's finding that railroad was negligent.
[6] We note that KCS relies on the apportionment of fault as determined by the jury, 58.6% to KCS and 26.4% to Mitchell, rather than the adjusted apportionment entered into judgment following the trial court's finding that the Parish's actions/inactions were not a cause-in-fact of the accident. As stated above, this adjusted figure left 68.94% of the fault to KCS while the remaining 31.06% was assigned to Mitchell. Although KCS relies on the lesser figure, no argument is made that the trial court's adjustment was incorrect in itself.